NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0448n.06
Filed: June 28, 2006

Nos. 04-1798 / 04-2205

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TECHNOLOGY RECYCLING CORP. d/b/a ECLIPSE TECHNOLOGY, RICHARD LAURENT, and THOMAS THOMSON, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| CITY OF TAYLOR, a municipal corporation, THOMAS BONNER, MARY SCLABASSI, MICHAEL NEIDY, JOHN HAGER, TROY TIFER, DONALD HELVEY, FIRE EQUIPMENT CO., a Michigan corporation, MARK THOMSEN, CITY OF FERNDALE, a municipal corporation; MICHAEL KITCHEN, TIMOTHY COLLINS, and WILLIAM WILSON, jointly and severally, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) ) ) ) | |

BEFORE: GIBBONS, GRIFFIN, and BRIGHT[*], Circuit Judges.

GRIFFIN, Circuit Judge.

The district court dismissed a civil-rights complaint under FED.R.CIV.P. 37(b)(2)(C) for repeated failure to comply with discovery orders. It also awarded defendants all their attorney fees,

---

[*]The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

citing Rule 37(b)(2) and 42 U.S.C. § 1988, the latter because they failed to provide a foundation for

their claims.  Plaintiffs appeal the dismissal and the fee award, and we affirm both.

I.

Technology Recycling Corp., Richard Laurent, and Thomas Thomson (collectively

"plaintiffs") instituted civil-rights actions in the district court against the City of Taylor and six of

its employees ("Taylor"), and the City of Ferndale and three of its employees ("Ferndale").

Plaintiffs allege:

> [T]he Taylor Police and Fire Departments refused to provide basic municipal
> services . . . unless Eclipse paid bribes to Taylor.  When Eclipse resisted, the Taylor
> Defendants engaged in a campaign to injure Eclipse's business and the livelihood of
> Plaintiff Richard Laurent.
>
> [Then-Ferndale police lieutenant] Thomson joined Eclipse as a loss prevention
> officer . . . .  When Thomson began developing evidence of Taylor's wrongdoing,
> Taylor's Police Chief . . . enlisted . . . Ferndale's police chief, to assist in stopping
> Thomson's activities for Eclipse.
>
> [Ferndale chief] and other members of Ferndale's Police Department then engaged
> in a campaign to harass and intimidate Thomson into stopping work for Eclipse.
> When Thomson refused, the Ferndale Defendants retaliated . . . by fabricating
> charges against Thomson and wrongfully terminating his employment.
> . . . .
> The Taylor Police Chief . . . told various Taylor officials that Laurent was a
> convicted felon, that he was involved in criminal activity, and that they should not
> do business with Laurent or do so "at your own risk."  Bonner also issued a memo
> to the Taylor Police Department stating that plaintiff Thomson was large, violent,
> believed to be armed and dangerous, and, if seen in Taylor, was to be stopped and
> held for questioning.  This warning put Thomson's life at risk.
>
> [Taylor Chief] also falsely told [Ferndale chief] that Eclipse was violating a contract
> with Ford Motor Company by selling bumpers on the internet rather than reclaiming
> the chromium from the bumpers as purportedly required by the contract.  . . . .

Taylor responds that Laurent and his company

> attempted to gain favor from the city where they had just located so they could avoid compliance with local laws and intimidate their employees through criminal prosecution. Tom Thomson was hired by Mr. Laurent because of his connection to the Ferndale Police . . . [and] because of Thomson's willingness to use ethically questionable and illegal methods . . . . When Laurent could not get the Taylor Police Department to go along with the fraudulent prosecution of [Eclipse employees], he . . . instituted this lawsuit . . . to . . . punish the Taylor Defendants.

On February 2, 2003, counsel held a phone conference pursuant to FED.R.CIV.P. 26(f), and plaintiffs' counsel agreed to produce copies of all audio and videotapes that supported plaintiffs' claims. On February 11, 2003, plaintiffs produced 246 pages of documents and 29 compact discs ("CDs") of conversations in which Thomson was a participant. Taylor stated in a brief filed with the district court, and plaintiffs have not disputed, that none of the CDs produced in February 2003 contained video, even though plaintiffs represented that the CDs were a complete response to defendants' request for all audio *and video*tapes supporting their claims. Moreover, Laurent later admitted that at least one tape was of poor quality and ended in the middle of a conversation:

Q. The tape ended, correct?

A. There's something wrong with the quality. They have better tapes than that version. That's a copy of a copy of a copy probably. You probably want a better tape.

Q. You'll agree with me that that tape ends in the middle of a conversation, correct?

A. Yeah, it sounds like it, yeah.

Laurent said there "absolutely" were other tapes, but plaintiffs had given them to unspecified law-enforcement agencies and media outlets.[1]

On February 28, 2003, defendants propounded interrogatories asking plaintiffs to identify the evidence they possessed in support of their claims, and a request for production ("RFP") of all remaining relevant audio and videotapes. A month passed without a response, so on March 28, 2003, defendants sent a letter requesting responses. *Id.* Plaintiffs did not respond, but rather directed their counsel Wasinger to withdraw, and he moved to do so on April 10, 2003.

On April 22, 2003, nearly eight weeks after the defendants served plaintiffs with requests for all other tapes purportedly supporting their claims, defendants filed motions to compel. During a phone conference on May 1, 2003, the district court ordered plaintiffs to produce the tapes by June 8, 2003. On June 5, plaintiffs orally told defendants that they would not comply with the May 1 order to answer interrogatories, so defendants asked for a hearing on the matter.

At a telephonic conference held on June 11, 2003, three days after the deadline imposed on May 1, the district court orally extended plaintiffs' time to produce the tapes to June 20, 2003. Plaintiffs do not claim they produced any video recordings, or any additional audio recordings, by the extended deadline.

---

[1]Defense counsel began Laurent's deposition on December 9, 2003, then continued it on March 9, 2004. Laurent cited a medical emergency as the reason for stopping the third deposition session, on April 14, 2004. The deposition resumed on April 15, 2004, but Laurent continually invoked a privilege not to answer questions about tapes allegedly given to law enforcement. Defense counsel tried to move this session to the courthouse so that a judge could rule on Laurent's assertions of privilege, but no judges were available.

On August 6, 2003, plaintiffs answered the February 28, 2003, interrogatories. This did not leave defendants adequate time to review the answers before deposing Thomson and Laurent, so defendants moved those depositions to October. In early September 2003, though, plaintiffs' counsel Lynn Shecter called and canceled, saying she was not available until late October or early November. Before that time arrived, however, Shecter moved to withdraw, on September 30, 2003.

On October 17, 2003, the district court allowed Shecter to withdraw and ordered plaintiffs to produce all outstanding discovery by November 13, 2003 – over eight months after Taylor first asked plaintiffs to produce tapes – or the complaint would be dismissed.

Plaintiffs did not produce any tapes by November 13, 2003, so defendants moved for sanctions. The district court held a hearing on December 17 and ordered plaintiffs to comply with the previous order and to file affidavits confirming compliance. "Shortly thereafter," presumably late December 2003 or January 2004, "[p]laintiffs produced 9 new CDs with . . . significant . . . additional audio recordings, 3 . . . videotapes, and about 500 documents."

Also in December 2003, Laurent testified that plaintiffs had recorded all conversations in which defendants defamed plaintiffs, and he promised they would produce those tapes:

> Q.    What damages has Richard Laurent sustained?
>
> A.    Well, you have to talk to the legal team and accountants for it, but I can tell you this, I don't appreciate walking into a business colleague and being told that we can't do business with you, because Taylor has told us that you're in the mob . . . .
>
> *Obviously, we have these things taped.*

> [W]e have your council people that are squealing on Ferndale like crazy . . ., but *it's all recorded and we will be glad to provide those for you.*

(Emphasis added.)  Earlier in that same deposition, Laurent claimed that plaintiffs' computers contained audio and video recordings of defendants' false accusations:

A.      Everything is recorded as far as allegations of saying, even down to the Ferndale council people saying, who said I was a mobster, a felon and a rapist.

Q.      And all those tapes and so forth support your allegations –
                              . . . .
A.      Without question.  And not one and not five.  We're talking about, probably, if not close to hundreds.
                              . . . .
[Q.]    Are you talking videotapes or audiotapes, can you clarify?

[A.]    Audio and video.  I think video on those.  I know a lot of them are recording [sic], and most of them, if not the majority, knew they were being taped, but fear for their jobs and lives, obviously, but are willing to talk to the judge . . . .
                              . . . .
[Q.]    Just so the record is clear, on behalf of my client, I'm making a demand for the hundreds of tapes he just referenced before these depositions go [sic].

[A.]    Well, they are in the computer.

On February 13, 2004, plaintiffs signed affidavits stating that they had produced all requested discovery.  Yet, at his deposition on March 9, 2004, Laurent testified that the tapes produced were incomplete, and that plaintiffs possessed some tapes they had not turned over at all:

Q.      Sir, I wanted to make clear exactly what your affidavit says, and I want you to answer my question, and the question I have to you is that you have through your attorneys provided us every single videotape that is in your possession or control that touches upon the City of Taylor and its defendants and the City of Ferndale and its defendants.
                              . . . .

- 6 -

> A.    All the tapes, video and audiotapes, that were in my possession regarding this matter as of the date this [affidavit] was signed – by the way, since this date there's more.  We'll be glad to give them to you.

On April 12, 2004, defendants filed their second motion to compel production of the tapes. That was *half a year* after the second extended deadline to produce all discovery, and five months after Laurent testified that plaintiffs had other tapes that they had not produced.  Defendants' motion specified exactly which of the recordings were inadequate because they started in the middle of conversations.

A few days later, on April 15, 2004, Laurent gave defendants a document entitled "Richard Laurent's updated Notes for Memory Refreshment," which seemed to say that plaintiffs would not try to obtain additional tapes that existed, and that they might deliberately withhold some such tapes:

> Make it crystal clear that the additional tapes, not in our possession and/or "control", will be revealed only by the witnesses at deposition or at the actual trial in October 2004.

Similarly, Laurent testified on March 9, 2004, that he was aware of other recordings that plaintiffs had not produced.  Plaintiffs assert the following:

> [T]he tapes he was referencing [sic] have <u>nothing to do with this case</u>.  They involve a completely unrelated, confidential criminal investigation by the DEA and the Fraser Police Department for which Laurent is providing information. . . . .

> Laurent is not an attorney, and when he was asked open[-]ended questions like "What other tapes exist, and who has them?" he responded beyond the scope of relevant discovery by stating that he was aware of these additional tapes, without regard to whether they have any bearing on this case. . . . .

Laurent unnecessarily, and still without relevance, complicated the appearance of the issue when he stated that he could not produce these irrelevant tapes because he had agreed with the law enforcement agencies to keep them confidential . . . .[2]

Three weeks after the second motion to compel, plaintiffs still had not produced more tapes, and their *third* counsel, Daniel Romano, moved to withdraw. On April 23, 2004, defendants moved to dismiss the complaint due to the plaintiffs' failure to obey discovery orders.

The other major discovery problem involved financial and accounting documents. In April 2003, defendants served plaintiffs with a request to produce accounting records; when plaintiffs produced no such records, defendants moved to compel in September 2003. After hearing argument, on October 17, 2003, the district court ordered plaintiffs to tender *all* outstanding discovery, including accounting documents, by November 13, 2003. The court warned that it would dismiss the complaint if plaintiffs did not produce the documents. Plaintiffs still failed to produce the documents, so defendants again moved to compel on November 14 and 21, 2003. On December 9, 2003, Laurent admitted that plaintiffs had not timely produced all documents and he was aware of the order to do so.

At a December 17, 2003, hearing, defendants submitted an affidavit wherein the accountant stated that plaintiffs had never given her the order directing production of her records, which she

---

[2]Laurent's references to other tapes cannot be construed to pertain to irrelevant tapes. Laurent never said he was talking about tapes that had nothing to do with plaintiffs' claims and, layman or not, he could not reasonably believe he was being asked if plaintiffs had such tapes. It is not clear error to find that Laurent knew he was being asked about only relevant tapes and responded accordingly. If Laurent were referring to irrelevant tapes, why did his notes state, "additional tapes . . . will be made available to defendants as soon as possible"? And why would he imply that the other tapes would be produced if not for the supposed privilege?

still had. Plaintiffs stated that they could not produce those records because they were subject to a state-court protective order. The district judge instructed plaintiffs that it was their burden to ask the state court for permission to produce the records, and he gave plaintiffs another sixty days to produce them. The sixty days elapsed, and plaintiffs neither produced the records nor showed that they unsuccessfully sought permission to do so.

On May 17, 2004, the district court held a hearing on the motions to dismiss. He articulated frustration with plaintiffs' failure to obey discovery orders, despite numerous opportunities to do so:

> Okay. In this matter, the Court has – you know, I've done everything [I] could. I've bent over backwards . . . . To sit back and do nothing, to go through three lawyers, each lawyer saying about the same thing that they're unable – the plaintiffs are unable or unwilling to cooperate, to do the things they need to do . . . . I think what's happening is that the plaintiffs are whipsawing and – for what reason, I don't know, I can't tell you, but the Court is tired of it. And the Court has given the plaintiffs about as much warning as I possibly can.
>
> . . . .
>
> As I say, I don't know what else I can do. When Mr. Wasinger was in this case, we had the problem. When Ms. Shecter was in this case, we had the problem. When Mr. Romano is in the case, we have the problem. It hasn't gone away. The only way to make it go away is to dismiss the case. The plaintiffs have to suffer some kind of consequences for failure to follow the orders of the Court, and the court rules.

The court dismissed the complaint with prejudice, stating, "I don't know what else I can do. I've warned the plaintiffs. I've begged the plaintiffs. And – they just won't do anything." The court granted plaintiffs' third counsel leave to withdraw and suggested that the failure to produce the requested items had been caused by plaintiffs, not their lawyers.

In August 2004, the district court granted defendants' fee petitions, awarding $82,220 to Taylor and $141,585 to Ferndale. Plaintiffs timely appealed, and their appeals were consolidated.

II.

A decision on whether and how to sanction discovery violations under Rule 37 is reviewed only for abuse of discretion, *Phillips v. Cohen*, 400 F.3d 388, 396 (6th Cir. 2005) (citing *NHL v. Metro. Hockey Club*, 427 U.S. 639, 642-43 (1976)), as is a § 1988 fee award, *Pouillon v. Little*, 326 F.3d 713, 717 (6th Cir. 2003) (citation omitted). We find an abuse of discretion only if we have "the definite and firm conviction that the district court committed a clear error of judgment[,]" *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005) (quoting *United States v. Miami Univ.*, 294 F.3d 797, 806 (6th Cir. 2000)). The district court abuses its discretion when it "relies on clearly erroneous findings of fact, . . . improperly applies the law, or . . . employs an erroneous legal standard," *United States v. Baldwin*, 418 F.3d 575, 579 (6th Cir. 2005) (quoting *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004)).

III.

Federal Rule of Civil Procedure 37(b)(2) provides, in pertinent part, that "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may [enter] . . . (C) An order . . . dismissing the action or proceeding or any part thereof . . . ." (boldface omitted). A party "fails to obey" a discovery order merely by failing to comply; no showing of willfulness, bad faith, or malice is needed. *Societe Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 208 (1958).

Whether the noncompliance with the order was willful or in bad faith bears only on the appropriate sanction. *Rogers*, 357 U.S. at 208. "Rule 37 should not be construed to authorize

dismissal of [a] complaint . . . when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault . . . ." *Id.* at 212. Conversely, "if a party has the ability to comply with a discovery order and does not, dismissal . . . is not an abuse of discretion." *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990) (internal quotation marks and citation omitted).

In determining whether a district court's order of dismissal pursuant to FED.R.CIV.P. 37(b)(2) was an abuse of discretion, this court considers whether (1) the "failure to cooperate was due to willfulness, bad faith, or fault"; (2) the adversary was prejudiced by the failure to cooperate; (3) the party "was warned that failure to cooperate could lead to dismissal"; and (4) "less drastic sanctions were imposed or considered[.]" *Bass v. Jostens*, 71 F.3d 237, 241 (6th Cir. 1995).

As to the first factor**,** it was not unreasonable for the district court to find that plaintiffs' noncompliance was the result of willfulness, bad faith, or fault. Plaintiffs' non-compliance with discovery orders was neither isolated nor short-lived. They disobeyed (1) the May 1, 2003, oral order to produce all tapes by June 8, 2003; (2) the June 11, 2003, oral order to produce all tapes by June 20, 2003; (3) the October 17, 2003, order to produce all outstanding discovery by November 13, 2003; and (4) the December 17, 2003, oral order to consult the state court and produce accounting documents in sixty days.

Plaintiffs try to excuse their noncompliance with the October 17, 2003, order, but to no avail. With regard to their third counsel, Romano, who entered an appearance on November 12, 2003, plaintiffs claim the following:

> [Romano] was unaware of the October 17 Order requiring Plaintiffs to produce accounting records by November 13. Romano did not become aware of the district court's Order until the Ferndale Defendants filed a Motion to Dismiss . . . on November 14, 2003. Once Romano became aware of the October 17, 2003 order, he informed Defendants that more than 5,000 pages of documents were available for copying.

But plaintiffs cannot evade their duty to obey the court's orders merely because they keep firing or alienating their counsel. Plaintiffs caused Romano's predecessor to withdraw, thereby creating the potential for something to "fall through the cracks" during the transition to new counsel.

And it is plaintiffs who retained Romano. "[A] client, having chosen a particular attorney to represent him in a proceeding, cannot 'avoid the consequences of the acts or omissions of this freely selected agent . . . .'" *McCurry v. Adventist Health Sys./Sunbelt, Inc.*, 298 F.3d 586, 595 (6th Cir. 2002) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397 (1993)). To learn about the October 17 order, Romano could have checked the docket sheet, consulted his clients, consulted predecessor counsel or her case file, or asked the court for copies of outstanding orders. If Romano did not have time to familiarize himself with the case before making his appearance, he could and should have sought to postpone the hearing. He did not.

Moreover, regardless of what Romano knew, *plaintiffs* knew the discovery deadline was fast approaching. Either at or after Shecter's withdrawal hearing, plaintiffs themselves could have asked for more time to comply with the October 17 order pending retention of new counsel. They did not.

In addition to the duration and extent of plaintiffs' noncompliance with discovery orders, there were other factors that reasonably led the district court to believe that plaintiffs were able to produce the materials sought but willfully and in bad faith chose not to do so.

Plaintiffs' explanations for their failure to produce the materials sought were uncorroborated and unbelievable. First, Laurent testified that plaintiffs gave some of the alleged tapes to law enforcement and media outlets. Yet Laurent was evasive and nonresponsive, refusing to identify who received the tapes or who provided them, and invoking a non-existent privilege:

Q.    Okay. Have you reviewed any documents, any records, any tangible things, videotapes, CDs? Have you looked [at] or listened to anything between your deposition in December and now in regards [sic] to this litigation?

A.    In regards [sic] to this litigation, directly?

Q.    Directly or indirectly.

A.    Well, indirectly, I'll have to say no I guess. That's a tough question. We have criminal investigations going on right now that, yes, I review, that indirectly could be affecting this, yeah.

Q.    When you say "we", who is "we"?

A.    Other agencies, law enforcement agencies.

Q.    And what other –

A.    I'd have to say they're privileged. That would be obstruction of justice if I start giving you this information.

Q.    Right now I'd like to know, what are the names of the other police organizations that are doing criminal investigations?

A.    I refuse to answer without a court order. That would be obstruction if I tell you what agencies are looking into what and that I reviewed tapes and documents. I'm sorry, but that's obstruction if I start telling you what agencies and why and what's going on.

Laurent had a similar exchange regarding the tapes plaintiffs supposedly gave the media:

Q.    Okay. What other tapes exist and who has them?

A.    News agencies.

Q.    What news agencies?

A.    WDIV had some tapes on their own investigations that we talked about. They did other investigation in talking to other witnesses that we have for this. For this piece I'm sure they recorded many hours of information other than just what little we gave them to confirm, deny the facts that we were alleging.

Q.    Okay. What other news agencies?

A.    I don't recall all of them. Mr. Thomson can best answer all those because I don't know other than that, only what I've been told. I don't have firsthand experience on any of this.

Q.    Are there any other tapes that you know exist that touch upon in any fashion the allegations involving the City of Taylor defendants and the City of Ferndale defendants, other than those that may be in the possession of WDIV and other unidentified news agencies?

A.    Law enforcement agencies.

Q.    What law enforcement agencies?

A.    Oh, God, there's quite a few. I have to say that's privileged anyway, law enforcement agencies.

Q.    Sir, I'm asking you questions.

A.    Yeah.

Q.    Can you please provide me the names of those law enforcement –
                               . . . .
A.    Again, I can't answer anything about who.

Q.    My question to you is, who provided those tapes to these law enforcement agencies?

A.    I can't divulge those names.

- 14 -

So far as the record reflects, plaintiffs *never* identified which agencies received tapes, nor did they identify which media outlets received tapes other than WDIV. Nor did plaintiffs explain why they supposedly gave original tapes to these entities without keeping copies for themselves, a plainly foolish and unlikely practice. *Cf. In re Riggs*, 240 F.3d 668, 670-71 (7th Cir. 2001) (" [Attorney] would have us believe that he kept *all* of his legal work on floppy disks (or other removable media), *of which he kept no backups*. . . . . [Attorney's] explanation thus does not hang together."). Nor did plaintiffs explain why they could not ask the recipients to return the tapes or copies thereof.

Moreover, if plaintiffs believed that some privilege covered the tapes, they were obligated to invoke the privilege in a timely response to each discovery request, cite authority for the privilege's existence and applicability, and seek a protective order. They did none of these things. *Cf. Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 155 (6th Cir. 1988) (affirming FED.R.CIV.P. 37(b)(2)(C) dismissal where plaintiff, among other things, was guilty of "evading questions, . . . refusing to identify persons he claimed provided information upon which his lawsuit was based, *claiming vague and spurious privileges*") (emphasis added).

Additionally, at a December 17, 2003, hearing, plaintiffs claimed that the reason they had not produced the accounting documents was that they were subject to a protective order entered by a Michigan state court. The court generously gave plaintiffs another sixty days to obtain the state court's permission to produce the documents, and then to produce them. Yet plaintiffs do not claim they made *any* effort to do so; indeed, defense counsel stated at a May 2004 hearing, without

contradiction, that "up until today, we've not heard anything from the plaintiff's side that they ever followed through to . . . see if those documents could be released."

On the contrary, on May 5, 2004, over five months after the court gave plaintiffs sixty days to produce the allegedly protected documents, plaintiffs filed a brief that merely repeats the assertion that they are protected. Plaintiffs even tried to blame *defendants* for plaintiffs' failure to seek the state court's permission to produce them: "Defense counsel was told to contact Ford and Visteon attorneys in regards to possible objections regarding to [sic] the protective order issued in that case. This was also never done." Plaintiffs' attempt to distract from their own dereliction founders upon the district court's clear instructions at the December 17, 2003, hearing: "If they believe that [a] document is covered under that protective order, then . . . since they are the plaintiffs in this case, that they have a duty to go to that court and . . . try to resolve that . . . ."

Moreover, on February 13, 2004, plaintiffs signed affidavits stating that they had produced all requested discovery. Yet, at Laurent's March 9, 2004, deposition, he testified that the tapes produced were incomplete and that plaintiffs possessed some tapes that they had not produced at all. This glaring contradiction could reasonably lead the district court to question plaintiffs' veracity and good faith.

*Cf. Torres-Vargas v. Pereira*, 431 F.3d 389 (1st Cir. 2005) (affirming dismissal where, among other factors, plaintiff misrepresented that he had complied with all discovery requests).

As one last factor supporting the inference that plaintiffs' failure to comply with discovery orders was willful and in bad faith, even when plaintiffs finally produced some accounting

documents in response to defendants' repeated requests and the court's own order, they apparently

did so in a haphazard fashion that hampered defense counsel's efforts to make use of them. At a

hearing on December 17, 2003, counsel had this exchange with the district court:

> THE COURT: When it was given to [defendants], was it Bates stamped and in sequential order in relation to the documents, or you don't know?
>
> [PLAINTIFFS]: I don't know. The only thing I know is when I received them, they were in sequential order, Bates stamped.
>
> [DEFENSE]: It was for the Ford case, . . . the general accounting reports.
> . . . .
> [DEFENSE]: . . . . I have personally gone through all of the documents. I would say less than fifty percent, probably in the neighborhood of twenty-five to thirty percent have Bates stamps on them. Sixty percent of the documents with no Bates stamps on them. And of the documents that are Bates stamped, they do not run sequentially . . . .

For this reason and those discussed above, it was not an abuse of discretion to find that plaintiffs'

failure to obey the discovery orders was willful and in bad faith.

As to the second of the four factors, plaintiffs' prolonged failure to cooperate with discovery

requests and orders substantially prejudiced defendants. Plaintiffs' foot-dragging, double-talk,

invocation of a non-existent privilege, and admittedly incomplete responses to interrogatories and

RFPs forced defendants to incur the expense of numerous motions and proceedings that otherwise

would not have been necessary. This includes Taylor's April 21, 2003, motion to compel answers

to its February 28, 2003, interrogatories and RFPs, Taylor's April 22, 2003, motion to compel

production of tapes, and the resultant May 1, 2003, telephonic hearing; Ferndale's September 19,

2003, motion to compel production of accounting documents, and the resultant October 8, 2003,

hearing; defendants' November 14, 2003, motions for sanctions, Ferndale's April 12, 2004, renewed motion to compel production of all tapes and of complete tapes, defendants' April 23, 2004, motions to dismiss, and the resultant May 17, 2004, hearing, fee petitions and the resultant August 25, 2004, hearing; negotiation over taxable costs; Ferndale's effort to enforce the judgment by seeking writs of garnishment in November 2004; and defendants' opposition to the instant appeals.

In fact, this case began in October 2002, and almost everything defendants did from February 2003 onward was occasioned by plaintiffs' failure to comply with legitimate discovery requests and orders. This includes filings and hearings in connection with the motions to withdraw filed by plaintiffs' three counsel, because it is reasonable to find plaintiffs at fault for their "revolving door" of counsel. As grounds for withdrawal, plaintiffs' first three counsel cited a substantial breakdown in the relationship, a breakdown in communication, and an inability or unwillingness to follow advice, respectively.

In addition to the costs imposed on defendants, plaintiffs also prejudiced defendants by impairing their ability to prepare a defense. *See Wittman v. Wilson*, 95 F. App'x 752, 754 (6th Cir.) ("[T]he existence of prejudice is clear because he undermined defendants' ability to defend this case."), *cert. denied*, 543 U.S. 873 (2004); *accord Adams v. Trs. of the N.J. Brewery Employees' Pension Trust Fund*, 29 F.3d 863, 874 (3d Cir. 1994) (prejudice includes "deprivation of information through non-cooperation with discovery" and need not include irremediable harm) (citation omitted).

As to the third factor, at an October 8, 2003, hearing, the district court expressly warned

plaintiffs that noncompliance could lead to dismissal of the complaint:

> Failure to either turn over the records by the 13th or to appear ready for the deposition pursuant to the notice and bring whatever documents are provided for in that, the – *if for some those things don't happen, the Court will dismiss the case.*
> . . . .
> *If they don't turn the records over, attorney or no attorney, then I'll dismiss the case on the 13th* [of November 2003].

(Emphasis added.) While that warning alone was enough, defendants filed a second motion to

compel production of the tapes on April 12, 2004. The motion specified exactly which of the

recordings were inadequate because they started in the middle of conversations. That put plaintiffs

on notice that if they had complete recordings of those conversations, they should produce them or

give a valid reason for not doing so. Then plaintiffs were further placed on notice by defendants'

subsequent motions for discovery sanctions, which requested dismissal. *See Harmon v. CSX*

*Transp., Inc.*, 110 F.3d 364, 368 (6th Cir. 1997).

The last of the four factors, whether the district court considered or imposed lesser sanctions

before dismissing, is no obstacle to affirmance either. Defendants have not identified any pre-

dismissal measure that can reasonably be viewed as a sanction, and we cannot discern one.

Defendants purport to find a "sanction" in the November 14, 2003, order, which allowed plaintiffs

another sixty days to comply with a prior order and ordered them to submit an affidavit certifying

compliance. Simply chastising plaintiffs and telling them to do what they were already required to

do by the Rules and by court order, however, is hardly a "sanction."

Because the district court did not *impose* any sanctions short of dismissal with prejudice, we consider whether the district court at least *considered* such lesser sanctions. The defendants identify no transcript, order, or opinion in which the district court discusses its consideration of any specific lesser sanction, and we find none. But a court's failure to make its consideration of lesser sanctions explicit does not necessarily require reversal. *See Reg'l Refuse*, 842 F.2d at 155 ("While it would be inappropriate to dismiss without considering the severity of this sanction and the availability of lesser sanctions, it is not an abuse of discretion to dismiss, even though other sanctions might be workable, if dismissal is supportable on the facts.").

Thus, even though the district court did not discuss *particular* lesser sanctions, that does not outweigh the other factors under the circumstances. The "imposition of lesser sanctions is a factor in our review, not a *sine qua non* for affirmance." *Harmon*, 110 F.3d at 367. As we have explained,

> [w]e have never held that a district court is without power to dismiss a complaint, as the first and only sanction . . . any such rule would conflict with . . . the plain language of [Rule] 37(b)(2). We are loathe to require the district court to incant a litany of the available lesser sanctions. Concomitantly, we do not assume that lesser sanctions were not considered simply because their consideration is not articulated.

*Id.* at 368 (internal citations omitted). The district court reasonably concluded that dismissal was warranted on the egregious facts of this case without resorting to lesser sanctions. *See id.* at 369 ("Presented with a record of sufficiently egregious conduct, then, this court need not hesitate to conclude that a district court has not abused its discretion by ordering dismissal as the first and only sanction.").

For these reasons, the district court did not abuse its discretion by dismissing the complaint with prejudice as a sanction for plaintiffs' willful failure to obey discovery orders.

IV.

Federal Rule of Civil Procedure 37(b)(2) provides, in pertinent part,

> [T]he court *shall* require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

(Emphasis added.) In a § 1983 or § 1985 action, a district court, "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs[.]" 42 U.S.C. § 1988(b). "'[W]hile prevailing plaintiffs are entitled to attorneys fees under that statute[3] in all but special circumstances, prevailing defendants are entitled to attorneys fees much less frequently.'" *Wolfe v. Perry*, 412 F.3d 707, 720 (6th Cir. 2005) (quoting *Smith v. Smythe-Cramer Co.*, 754 F.2d 180, 182 (6th Cir. 1985)). "[A] prevailing *defendant* should only recover upon a finding by the district court that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Wolfe*, 412 F.3d at 720 (quoting *Wayne v. Village of Sebring*, 36 F.3d 517, 530 (6th Cir. 1994)).

---

[3]In *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417 (1985), the Supreme Court discussed the attorney fee provision in Title VII, not § 1988. "We have held, however, that 'Congress intended that the standards for awarding fees under section 1988 should be the same as those under Title VII and other acts allowing awards of attorneys fees.'" *Wolfe*, 412 F.3d at 720 n.5 (quoting *Smith v. Smythe-Cramer*, 754 F.2d 180, 183 (6th Cir. 1985)).

"In light of a district court's superior understanding of the case and the desirability of avoiding frequent appellate review of essentially factual matters," a § 1988 fee award "is entitled to substantial deference." *Reed v. Rhodes*, 179 F.3d 453, 469 n.2 (6th Cir. 1999) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). The court must nonetheless provide "a concise but clear explanation of its reasons," *Hensley*, 461 U.S. at 437, and we have found an abuse of discretion where the court failed to adequately explain its reasoning or consider the parties' arguments, *Geier v. Sundquist*, 372 F.3d 784, 791-92 (6th Cir. 2004).

Pursuant to Rule 37(b)(2), the district court was required to award defendants the fees they incurred *as a result of* plaintiffs' failure to obey discovery orders, unless one of the stated exceptions applied. Nothing in the record suggests that plaintiffs' failure to obey was "substantially justified" or that a fee award would be unjust. Accordingly, the court did not abuse its discretion in awarding those fees that were *attributable to plaintiffs' failure to obey discovery orders*.

But some filings and proceedings were not caused by plaintiffs' failure to obey discovery orders. Defendants would have incurred the cost of such filings and proceedings even if plaintiffs had promptly and fully obeyed those orders. Thus, the court needed authority *other than Rule 37(b)(2)* to award defendants fees beyond those caused by plaintiffs' failure to obey discovery orders.

Because plaintiffs asserted claims under § 1983 and § 1985, § 1988 authorizes the award of such fees if those claims were "frivolous, unreasonable, or without foundation," *Wolfe*, 412 F.3d at 720 (citation omitted), or if "no evidence supports the plaintiff's position or the defects in the suit

are of such magnitude that the plaintiff's ultimate failure is clearly from the beginning or at some significant point in the proceedings after which the plaintiff continues to litigate[.]" *Smith*, 754 F.2d at 183. For this purpose, it is immaterial whether plaintiffs instituted the action in bad faith. *Wolfe*, 412 F.3d at 720.

Plaintiffs contend that they presented enough evidence to give their claims at least some factual and legal foundation. Yet plaintiffs merely state, in conclusory fashion, that "[p]laintiffs' [sic] have identified in their second amended complaint and their discovery responses numerous witnesses, documents and other evidence that support their claims." They do not explain how particular pieces of evidence tend to establish the elements of their claims.

Moreover, plaintiffs' egregious failure to comply with discovery orders supports a powerful adverse inference about the strength of plaintiffs' case. Plaintiffs repeatedly touted and promised to produce critical "smoking gun" evidence, then failed or refused to produce it; belatedly produced an incomplete collection of evidence; falsely stated that they had produced all the evidence ordered; deliberately withheld evidence; strained credulity by claiming that they gave away original tapes of critical conversations, keeping none for themselves, and made no effort to get copies; asserted a nonsensical privilege as a reason for failing to produce more or better evidence of defendants' allegedly defamatory statements; agreed to seek permission from the state court to produce financial and accounting documents, but never did so; and so on.

In light of these facts, the district court reasonably concluded that plaintiffs did not produce probative and potentially persuasive evidence of defamation, conspiracy, and damages because they did not have any. The district court stated as follows:

> [T]hey never put themselves in a position where this Court could conclude anything other than their case was unreasonable or without merit because they didn't provide the information that would have at least established . . . some basis for their lawsuit.
> . . . .
> [I]f they had the meat, they would have put it on the grill, they never did. They never brought it forward. . . . [I]n fact, if anything, they kept avoiding it both by deposition, by discovery materials and so forth. So the Court can only conclude that if they had it, they would have done it, and they didn't do it; . . . .

"When parties present no valid objections to discovery and intentionally withhold properly requested information, courts have the authority to presume that the party's refusal to produce the information is 'an admission of the want of merit in the asserted defense'" or claims. *Chilcutt v. United States*, 4 F.3d 1313, 1324 (5th Cir. 1993) (quoting *Hammond Packing Co. v. State of Arkansas*, 212 U.S. 322, 351 (1909)); *see also Ins. Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 709 (1982) ("Petitioners' failure to supply the requested information as to its contacts with Pennsylvania supports 'the presumption that the refusal to produce evidence . . . was but an admission of the want of the merit in the asserted defense'" of lack of jurisdiction) (quoting *Hammond*, 212 U.S. at 351); *Polanski v. Detroit Police*, No. 85-1503, 798 F.2d 470, 1986 WL 17175, at *3 (6th Cir. June 6, 1986) (where § 1983 plaintiff alleged that police beat him even though he had not fired a gun, district court did not abuse its discretion by striking complaint as FED.R.CIV.P. 37 sanction for failing to produce letter he wrote stating that he *had* fired a gun; "the

- 24 -

appellant's noncompliance supports the presumption that the refusal to produce evidence . . . was but an admission of the want of merit in the asserted defense") (quoting *Bauxites*, 456 U.S. at 709).[4]

The district court also correctly rejected plaintiffs' argument that their failure to provide an evidentiary foundation for their case was due to lack of discovery:

> [T]hose depositions together with that which they were supposed to provide would have at least given a basis for their claims, but they never provided even that. And the one that sticks in my mind the most, you know, the one they kept saying is the most compelling one . . . are the recordings of these conversations. Yet, given several opportunities . . . they still never provided it.

---

[4]*Accord Estrada v. Speno & Cohen*, 244 F.3d 1050, 1059 ("As in *Hammond Packing* . . . , Speno's refusal to submit to a deposition, as well as Speno's and Cohen's refusal to attend the aspect of the May 24th hearing concerning Thistle's potential conflict of interest demonstrate a steadfast failure on their part to produce material evidence lawfully called for. Their defiance . . . may properly be viewed as 'an admission of the want of merit in the asserted defense.'") (internal citations omitted), *amended on denial of reh'g & reh'g en banc*, No. 99-56013 (9th Cir. Mar. 30, 2001); *In re Victor Internat'l, Inc.*, 278 B.R. 67, 76 (Bankr. D.N.J. 2002) (bankruptcy rule that is identical to FED. R. CIV. P. 37(b)(2), "allow[ing] the court to strike a party's claim or pleading for failure to comply with a discovery order . . . codifies the court's authority to create a presumption of fact 'that the refusal to produce evidence . . . was but an admission of the want of merit of the asserted defense.") (quoting *Bauxites*, 456 U.S. at 705), *aff'd*, 97 F. App'x 365 (3d Cir. 2004); *Buckeye Union Ins. Co. v. Boggs*, 109 F.R.D. 420, 423 (S.D. W. Va. 1986) ("[T]here is a presumption that the discovery sought would be adverse to the Defendants because of their repeated and knowing refusal to answer the discovery requests.") (citing *Joselson v. Lockhart-Bright Assocs.*, 95 F.R.D. 160, 163 (E.D. Pa. 1982)).

*Cf. Wittenberg Coal Co. v. Compagnie Havraise Peninsulaire de Navigation a Vapeur*, 22 F.2d 904, 905 (2d Cir. 1927) (Rule 58 of the former Equity Rules, which authorized the court to strike an answer due to the defendant's failure to answer interrogatories, showed that "for failure to produce such evidence the law might authorize a presumption in the proper case against the party refusing, justifying the entry of a judgment by default . . . .") (citations omitted); *Dunham v. Hotelera Canco, S.A. de C.V.*, 933 F. Supp. 543, 552 (E.D. Va. 1996) ("The Court does, however, look upon plaintiff's failure to provide any response at all to discovery requests on the issue of personal jurisdiction with some suspicion.").

Although plaintiffs could not conduct depositions until they had been deposed, it was plaintiffs who caused Laurent's deposition to be postponed, continued three times, and prolonged by Laurent's belligerence, nonresponsiveness, and invocation of a non-existent privilege. And it took place against the backdrop of delays occasioned by plaintiffs' refusal to cooperate with a succession of lawyers. As the district court remarked, "Plaintiff has had nothing but time to do it. Plaintiff has been too busy getting new attorneys and fighting all the motions . . . . [I]f they could keep a lawyer long enough, they may be able to get some depositions."

In short, plaintiffs had ample time and opportunity to be deposed, to conduct depositions, and to produce substantial evidence to support their claims if it existed, so the district court did not err in finding their case to be without foundation.[5] *See Wilson-Simmons v. Lake Cty. Sheriff's Dep't*, 207 F.3d 818, 823-25 (6th Cir. 2000) (affirming § 1988 fee award where plaintiff failed to present evidence sufficient to make out a prima facie case under §§ 1981 and 1983).

---

[5]Plaintiffs argue that their case cannot have been without foundation, because the district court partially denied defendants' motions for judgment on the pleadings under FED. R. CIV. P. 12(c). But a 12(c) inquiry and a § 1988 fee inquiry are apples and oranges. Judgment on the pleadings turns on legal issues, not an assessment of the evidence. *See, e.g., Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432 (6th Cir. 2006) (reviewing denial of Rule 12(c) motion which asserted lack of jurisdiction, res judicata, and immunity), *reh'g en banc denied*, No. 04-4109 (6th Cir. Apr. 24, 2006). On a 12(c) motion, the court "must . . . accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief." *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005) (quoting *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001)). Thus, the partial denial of defendants' 12(c) motions does not undermine the conclusion that plaintiffs failed to provide a factual foundation for their claims.

Accordingly, it was not an abuse of discretion to award defendants all their attorney fees under 42 U.S.C. § 1988, not merely those directly occasioned by plaintiffs' failure to obey discovery orders.

V.

For the foregoing reasons, we affirm the dismissal of the complaint as a sanction under FED.R.CIV.P. 37(b)(2)(C) and the award of all attorney fees to the appellees under 42 U.S.C. § 1988.

BRIGHT, Circuit Judge, concurring in part and dissenting in part.

This case demonstrates that in some cases the problems in discovery produce endless confusion and litigation without contributing one bit to the resolution of the case. It seems to me in reviewing this voluminous record relating to discovery disputes that defendants asked for too much and plaintiffs gave too little. The defendants' requests were very burdensome, perhaps excessive.

In the days before complete discovery became the way to try a lawsuit, a court, after a reasonable time, would set the case for trial and plaintiffs would be required to put up or shut up. That is not the situation in today's litigation world.

Here, essentially the defendants got the relief which they desired. By inundating plaintiffs with massive discovery requests, which were not met, the court granted a dismissal. I agree with that disposition, but I would not add a bonus to the defendants' successful lawsuit by awarding them attorney fees as well. As I see it, the claims were not completely groundless at the outset of the action.

Under section 1988, a prevailing defendant should recover attorney fees only upon a finding by the district court that the action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. *Wolfe v. Perry*, 412 F.3d 707 (6th Cir. 2005). This standard was not met here.

The district court awarded attorney fees under 42 U.S.C. § 1988 for two reasons. First, the court said that "the unreasonableness of the plaintiff [in repeatedly delaying and not fully responding

to discovery] is circumstantial evidence . . . of the reasonableness of the case, the groundless[ness] of the case, and the frivolity of the case."

The court was disturbed by the notion that the plaintiffs were not providing information during discovery because they were saving it for trial, and stated that the plaintiffs "never put themselves in a position where this Court could conclude anything other than their case was unreasonable or without merit because they didn't provide the information that would have at least established to some extent some basis for the lawsuit." Second, the district court said that the plaintiffs' behavior "would lead one to the conclusion that perhaps they were here for other reasons than the case itself."

The court thought that the plaintiffs' unreasonable failure to respond to discovery showed that the case was itself unreasonable. In doing so, it appears to have been engaging in the kind of "hindsight logic" that is discouraged in the context of section 1988. As the United States Supreme Court has noted, this kind of reasoning is discouraged precisely because "[d]ecisive facts may not emerge until discovery or trial . . . . Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit."[6] *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978). By dismissing the case before completing discovery, the district court did not give the plaintiffs the opportunity to show whether

---

[6]Although the Supreme Court in *Christiansburg* was discussing the attorney fee provision in Title VII, not section 1988, "Congress intended that the standards for awarding fees under section 1988 should be the same as those under Title VII . . . ." *Smith v. Smythe-Cramer Co.*, 754 F.2d 180, 183 (6th Cir. 1985).

they had a reasonable ground for bringing suit. While the plaintiffs' repeated failure to comply with discovery orders may have been an appropriate basis on which to dismiss the case, it is not enough to award attorney fees under section 1988 because the court simply did not have enough information to determine whether the case was "frivolous, unreasonable, or without foundation". *See Wolfe v. Perry*, 412 F.3d 707 (6th Cir. 2005).

The court's second reason for awarding fees was that the plaintiffs' unreasonable behavior may have been an indicator that "they were here for other reasons than the case itself." If it is true that the plaintiffs never had any legitimate basis for bringing suit, and did so simply to be contentious or cause problems for the defendants, this would be an entirely appropriate basis for awarding attorney fees under section 1988. However, as the court noted, it based its statement on little more than circumstantial evidence, and the mere failure to respond to discovery is not enough of an indicator to warrant the "extreme sanction" of an attorney fee award under section 1988. See *Riddle v. Egensperger*, 266 F.3d 542, 552-53 (6th Cir. 2001) ("A court must be sensitive that an award of attorney's fees against a losing plaintiff in a civil rights action is an extreme sanction . . . .").

Accordingly, I join in the dismissal of plaintiffs' case, but would reject as unfounded, the award of attorney fees.