IN RE: George A. BAVELIS, Debtor.

George A. Bavelis, et al., Plaintiffs,

v.

Ted Doukas, et al., Defendants.

Case No. 10–58583
Adv. Pro. No. 10–2508

United States Bankruptcy Court,
S.D. Ohio, Eastern Division.

Signed 02/22/2017

Marion H. Little, Jr, Zeiger, Tigges & Little LLP, W Mark Jump Columbus, OH, for Plaintiffs.

Justin W. Ristau, Bricker & Eckler LLP, Franklin Connor Davis, Columbus, OH, for Defendants.

John M. Stravato, pro se.

John Doe Defendants 1–25, pro se.

## OPINION AND ORDER (A) DETERMINING THAT GARY A. GOLDSTEIN, TED DOUKAS AND QUICK CAPITAL OF LONG ISLAND CORP. HAVE ENGAGED IN SANCTIONABLE MISCONDUCT AND (B) ESTABLISHING PROCEDURES FOR DETERMINING THE AMOUNT OF THE SANCTIONS

John E. Hoffman, Jr., United States Bankruptcy Judge

### I. Introduction

This matter is before the Court in the Chapter 11 case of George A. Bavelis and the adversary proceeding he commenced against several parties, including Ted Doukas. Earlier in the case, Doukas sought to establish that one of his wholly owned companies, Quick Capital of Long Island Corp. ("Quick Capital"), held a $14 million secured claim against Bavelis's bankruptcy estate. But unbeknownst to Bavelis, Doukas had already caused Quick Capital to assign its interest in the note and security agreement on which the claim was based to Socal Capital LLC ("Socal"), a company in which Doukas had no interest. Gary A. Goldstein, counsel for Doukas and Quick Capital, admits that he became aware of the assignment soon after Doukas executed it.

Fully aware of the assignment, Goldstein, Doukas and Quick Capital (collectively, the "Respondents") engaged in a two-year long pattern of deception designed to conceal the assignment from Bavelis and the Court. They failed to produce the assignment in response to multiple document requests that should have elicited it, and they even sent Bavelis's counsel discovery responses stating that no responsive documents existed. The Respondents concede that Quick Capital was no longer a creditor post-assignment, yet they filed several documents with the Court—including a motion seeking the appointment of a Chapter 11 trustee—that identified Quick Capital as a creditor after Doukas executed the assignment. The Respondents then participated in a four-day hearing in which they attempted, without once mentioning the assignment, to establish that Quick Capital held a secured claim.

Attempting to defend their conduct, the Respondents raise a slew of arguments, but they all fall flat. Withholding material evidence and lying to a party and the

Court constitute bad faith and an affront to the judicial system that must be redressed. Accordingly, sanctions will be imposed against the Respondents for this bad faith misconduct under § 105(a) of the Bankruptcy Code and based on the Court's inherent authority. The sanctions will include attorneys' fees resulting from the Respondents' bad faith litigation conduct and also may include punitive damages. In addition, because Goldstein was admitted to practice law before the Court and his conduct multiplied these proceedings unreasonably and vexatiously, he also will be sanctioned under 28 U.S.C. § 1927.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this matter under 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O).

## III. Procedural History

On July 20, 2010 (the "Petition Date"), Bavelis filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and three months later he commenced this adversary proceeding. The Court confirmed Bavelis's Chapter 11 plan, which provides for 100% payment of all creditors' claims, on December 12, 2014.

The parties brought this matter before the Court by filing:

1. the Motion of Debtor in Possession/Plaintiff George A. Bavelis for Order Requiring Defendants Quick Capital of LI, Inc., Ted Doukas, and Attorney Gary Goldstein to Show Cause as to Why They Should Not Be Sanctioned Under 11 U.S.C. § 105 and This Court's Inherent Authority (the "Motion") (Adv. Doc. 348, Doc. 559); [1] and

2. the response to the Motion filed by Doukas and Quick Capital (Adv. Doc. 366), Goldstein's joinder in the response (Adv. Doc. 367), and Bavelis's reply in support of the Motion (Adv. Doc. 375).

Bavelis seeks attorneys' fees and costs as well as punitive damages from the Respondents because they (a) failed to produce "clearly responsive documents in discovery that would have disclosed Quick Capital's true status as a non-creditor" and (b) filed documents that "included direct misrepresentations about Quick Capital's 'creditor' status." Mot. at 1–2. In light of the allegations in the Motion, the Court entered an order (a) directing the Respondents to appear and show cause why they should not be sanctioned under § 105(a) of the Bankruptcy Code and the Court's inherent authority and (b) directing Goldstein individually to appear and show cause why he should not be sanctioned under 28 U.S.C. § 1927 (Adv. Doc. 604).

---

1. References to "Doc.—" are to docket entries in Bavelis's bankruptcy case, Case No. 10–58583, and references to "Adv. Doc.—" are to docket entries in this adversary proceeding, Adversary Proceeding No. 10–2508. The versions of the relevant documents filed in the bankruptcy case and the adversary proceeding are identical, so only the versions filed in the adversary proceeding will be referenced in the remainder of this opinion. For the convenience of the reader, documents that both appear on the docket and were admitted as exhibits will be referenced by the docket and exhibit number. The Court takes judicial notice of the docket in Bavelis's bankruptcy case, the claims register, the docket in this adversary proceeding, and the contents of the documents filed in the bankruptcy case and the adversary proceeding. *See In re Kmart Corp.*, 362 B.R. 361, 372 n.9 (Bankr. N.D. Ill. 2007) (taking judicial notice of entries on the court's docket and the contents of documents filed in the bankruptcy case, but not the truth of the facts asserted in those documents), *aff'd sub nom. Philip Morris Capital Corp. v. Kmart Corp.*, No. 07 C 1926, 2007 WL 3171316 (N.D. Ill. Oct. 24, 2007).

The show cause order provided the Respondents with more than three months' notice of the hearing on the Motion and the show cause order (the "Show Cause Hearing"). In addition, the Court entered an order (Adv. Doc. 606) establishing a discovery schedule and deadlines for filing stipulations and witness and exhibit lists.

The Show Cause Hearing was held over the course of two days. The transcript of the first day of the Show Cause Hearing (Adv. Doc. 664) will be referred to as "Transcript I," and the transcript of the second day (Adv. Doc. 666) as "Transcript II." [2] Goldstein and Doukas testified during the Show Cause Hearing, as did Richard Stovall, bankruptcy counsel for Bavelis. In addition, Bavelis's Exhibits 206, 210, 215, 217–239, 242–249, 251–261, 264, and 269–279 were admitted into evidence without objection, Tr. II at 31–45, and Doukas's Exhibit K also was admitted into evidence without objection. Tr. II at 55. Doukas and Quick Capital were represented by counsel during the Show Cause Hearing. Acting pro se, Goldstein chose not to present a case in his defense, but instead rested solely on his testimony offered on cross examination. Tr. I at 172–76.

In accordance with an order that was amended multiple times at the request of the parties, Bavelis filed proposed findings of fact and conclusions of law (Adv. Doc. 675), as did Goldstein (Adv. Doc. 676) and Doukas and Quick Capital (Adv. Doc. 677).[3]

## IV. Findings of Fact

On December 3, 2010, Quick Capital filed a proof of claim asserting a secured claim in the amount of $1,667,791.10 based on a promissory note (the "Note") and a security agreement (the "Security Agreement") that Bavelis signed before the Petition Date. Claim 49–1. Several months later, Quick Capital filed an amended proof of claim based on the same loan documents, asserting a secured claim in the amount of $14 million (the "Claim"). Claim 49–2. The Court disallowed the Claim after finding, among other things, that Doukas fraudulently induced Bavelis to sign the Quick Capital loan documents. *Bavelis v. Doukas (In re Bavelis)*, 490 B.R. 258, 284 (Bankr. S.D. Ohio 2013) ("*Bavelis I*"), aff'd, No. 13–8015, 2013 WL 6672988 (6th Cir. BAP Dec. 19, 2013), aff'd, 773 F.3d 148 (6th Cir. 2014). *Bavelis I* is final and nonappealable. Leading up to that decision, however, the Respondents engaged in the dishonest conduct detailed below, which came to light only after the decision was issued. And it is this dishonest conduct by the Respondents following the Petition Date that warrants the imposition of sanctions.

## A. Background

Doukas is the sole shareholder and only officer of Quick Capital. Tr. I at 35–36. On April 6, 2011, he signed a document in his capacity as the President of Quick Capital entitled "Assignment and Assumption Agreement" (the "Assignment") (Ex. 218),

**2.** The entirety of Transcript I covers the first day of the Show Cause Hearing, while Pages 1 through 55 of Transcript II cover the second. The remainder of Transcript II covers the second phase of a trial on the remaining claims set forth in Bavelis's amended complaint (the "Amended Complaint") (Adv. Doc. 490). Because certain of the remaining claims in the Amended Complaint are non-core, the Court is not entering a final order as to them, but instead is transmitting proposed findings of fact and conclusions of law to the District Court.

**3.** Doukas's and Quick Capital's proposed findings of fact and conclusions of law also relate to the remaining counts of the Amended Complaint. The portions relevant to the Show Cause Hearing are located at pages 46 through 54.

thereby effectuating the sale of all of Quick Capital's "right, title, interest, claim or demand" in the Note and the Security Agreement to Socal for $1.8 million. Ex. 218. Under the terms of the Assignment, the first $2.7 million of any recovery on the Note was to be paid to Socal, and any recovery in excess of $2.7 million was to be paid 25% to Socal and 75% to the other party to the Assignment, an entity known as Avatara of NY Corp. *Id.* at 2–3. An individual named Ian Chen owned 99% of Socal, and Chen's brother owned the remaining 1%. Ex. 221 at 118–19. According to Chen, the only capital contributions made to Socal were made by his parents and certain of his aunts and uncles. *Id.* at 39–40. John Stravato, an attorney who had acted as counsel for Doukas and his companies from time to time, owned Avatara. Ex. 222 at 80, 83; Tr. II at 8–9.

There is no evidence that Doukas or Quick Capital had any ownership interest in Socal or Avatara or that Doukas or Quick Capital had any direct or indirect interest in a recovery on the Note. In fact, Doukas, Quick Capital and Socal later stipulated that the Assignment eliminated any interest that Quick Capital otherwise had as a creditor of Bavelis's bankruptcy estate. *See* Adv. Doc. 328 ¶ 13 ("With the assignment of the QC Loan Documents, Quick Capital has no claims against Mr. Bavelis or his estate and is not a party in interest as contemplated under Title 11 of the United State[s] Code for any purposes in the Chapter 11 Case."); *see also* Tr. I at 44. Goldstein likewise conceded that Quick Capital was not a creditor of the estate after it assigned the loan documents to Socal, Tr. I at 45–46, and he also admitted that Doukas—who had not even filed a proof of claim in Bavelis's bankruptcy case—personally would have recovered nothing on the Note post–Assignment. Tr.

I at 46–47, 144–45. In short, as a result of the Assignment, neither Doukas nor Quick Capital was a creditor of Bavelis's estate, and thus neither party was entitled to any recovery on account of the Claim.

Goldstein had begun representing Doukas and Quick Capital in Bavelis's bankruptcy case and the adversary proceeding in January 2011. Tr. I at 28. While Goldstein contends that he did not represent Doukas and Quick Capital in connection with the execution of the Assignment, it is undisputed that he had become aware of the Assignment by early May 2011. Tr. I at 43. On or about May 5, 2011, Goldstein sent one of Socal's managers—John Stravato's son, Lennon Stravato—an engagement letter regarding Goldstein's representation of Socal in its capacity as the assignee of the Note and the Security Agreement (the "Engagement Letter") (Ex. 277). Goldstein stated in the Engagement Letter that he would continue to represent Quick Capital. The Engagement Letter did not disclose Goldstein's continued representation of Doukas, but it is undisputed that Goldstein indeed continued to represent Doukas personally. It is also undisputed that Goldstein did not disclose any conflicts of interest arising from his joint representation of Doukas, Quick Capital and Socal in the Engagement Letter. Tr. I. at 139–40, 145–46.

Goldstein acknowledged in the Engagement Letter that the Federal Rules of Bankruptcy Procedure might require filing a notice of the Assignment. Ex. 277 at 3; Tr. I at 48, 57. But Goldstein nonetheless advised Lennon Stravato, who was Goldstein's only contact at Socal, Tr. I at 140, to "withhold filing the [A]ssignment," because "[t]hat way [Bavelis and his attorneys] must deal with Ted [Doukas] and can't get into how much Socal paid for the

claim." Ex. 277 at 2.[4] The goal, Goldstein advised Stravato, was to "force a settlement or actually try the case someplace to secure the maximum amount of return of the $14,000,000 claim." *Id.*

The strategy, of course, could not succeed if the Respondents revealed the Assignment to Bavelis or the Court. In view of this strategy, the Respondents no doubt realized that they could not keep Bavelis in the dark about the Assignment and at the same time respond truthfully to discovery requests pertaining to it. And they also undoubtedly knew that Quick Capital would need to mislead the Court if it was going to litigate the validity of the Claim when it no longer had an interest in it. The Respondents would have been further aware of the need to double down on their duplicity if Quick Capital was going to seek affirmative relief based on its purported standing as a creditor. It also would have been readily apparent to them that Doukas would need to participate in the scheme indirectly as the President and sole owner of Quick Capital. Not only that, but Doukas would need to be involved directly in the deception if he was going to personally respond to discovery requests that called for the production of the Assignment and if documents that identified Quick Capital as a creditor were going to be filed on his behalf personally. As detailed below, in the course of events that followed the Assignment, the Respondents chose deceit at every turn.

## B. The Respondents' False Representations During Discovery

The Respondents' deceptiveness infected the discovery process. More than five months after Goldstein became aware of the Assignment, Quick Capital responded to an October 2011 document request by which Bavelis sought "all contracts or agreements, including but not limited to loan agreements, to which Quick Capital has been or is a party, for which the value exceeds $25,000 [since January 1, 2007]." Ex. 226 at 4. The Assignment is a document that clearly should have been produced in response to this request; it was an agreement to which Quick Capital was a party, it was entered into well after January 1, 2007, and the value to be received by Quick Capital far exceeded $25,000. Yet Quick Capital's response failed to mention the Assignment, stating only "[o]ther than the instant transaction [i.e., the Note and the Security Agreement] no documents." *Id.* This response was untrue and, given their knowledge of the Assignment, Goldstein and Doukas knew it was untrue. Also untrue was Quick Capital's response to Bavelis's request for documents relating to "assets held by Quick Capital anytime from January 1, 2007 to the present, the status of the assets, the disposition of the same, and the timing of the disposition." *Id.* The Quick Capital loan documents had been personal property assets held by Quick Capital since the time Bavelis signed the documents in June 2009, and Quick Capital had disposed of its interest in these assets by way of the Assignment. Yet Quick Capital responded to this request by stating "NO Documents." *Id.* at 5. Goldstein concedes that the Assignment was not produced in response to Bavelis's October 2011 document requests. Tr. I at 75–77.

---

4. The copy of the Engagement Letter that was initially produced to Bavelis was almost entirely redacted, and the second version that he received was redacted to conceal Goldstein's advice to withhold filing the Assignment. Exs. 271 & 274. Bavelis obtained an unredacted copy of the Engagement Letter only after Socal entered into a settlement agreement with Bavelis and Socal agreed to waive any attorney-client privilege with respect to its communications with Goldstein. Exs. 275–278 (Docs. 779 & 805).

Acting in his personal capacity, Doukas joined Quick Capital in making additional false representations during discovery. In June 2013, Bavelis sought "documents sufficient to identify . . . assets held by [Quick Capital] anytime from January 1, 2007 to the present, the status of the assets, the disposition of the same, and the timing of the disposition." Ex. 239 at 12. Again, Doukas and Quick Capital clearly should have produced the Assignment in response to this request. But rather than doing so, they offered the following response: "Previously produced; no additional documents will be produced." *Id.* Bavelis also requested the production of "all documents sufficient to identify the recipient(s) (i.e., transferees) of any and all transfers of real or personal property . . . [by Quick Capital] since December 1, 2009," and he separately asked for "any agreements relating to any transfers of real or personal property . . . by [Quick Capital] since December 1, 2009." *Id.* at 14. The Assignment clearly was a document identifying the transferee (Socal) of a transfer of personal property of Quick Capital (its interest in the Quick Capital loan documents) entered into after December 1, 2009, yet this request likewise failed to elicit the Assignment.

Bavelis's counsel knew to ask about Socal because, in response to a question from Bavelis's counsel during a four-day hearing in April 2012 on Bavelis's objection to the Claim (the "Claim Objection Hearing") regarding "[any] claim [Doukas] assisted others in buying," Doukas identified the claim filed by Independent Bankers' Bank of Florida ("IBB") and Socal as its purchaser. Adv. Doc. 199 (Apr. 12, 2012 Tr.) at

1010–11. Bavelis therefore asked for "[a]ny form of agreement or contract entered into between or among" certain entities, including Socal and Quick Capital. *Id.* at 19; *see also id.* at 17. Although the Assignment clearly fit the bill—it was an agreement between Socal and Quick Capital—the Respondents again failed to identify or produce it in response to the June 2013 document requests. As he did with respect to the October 2011 document requests, Goldstein concedes that the Assignment was not produced in response to Bavelis's June 2013 document requests. Tr. I at 83. In short, Goldstein had been aware of the Assignment since at least May 2011, and he responded falsely to each of the document requests discussed above after that date. Furthermore, by the time Goldstein assisted Doukas and Quick Capital in responding to Bavelis's document requests in June 2013, he not only was aware of the Assignment, he admittedly had obtained a copy of the Assignment. *See* Tr. I at 42–43, 50, 80, 83–84, 90–91.[5] Goldstein signed all of these discovery responses. He also provided copies of the discovery requests and discovery responses to Doukas. Tr. I at 59, 70–75.

In sum, time and time again the Respondents failed to produce the Assignment in response to document requests that clearly called for its production, and they even falsely stated that no responsive documents existed. If the Respondents had responded honestly during discovery, then Bavelis would have known that motions and other documents submitted in the name of Quick Capital instead should have been filed by Socal. Armed with that

---

**5.** Goldstein initially testified that he did not "remember ever seeing [the Assignment] . . . until [Bavelis's counsel] brought it to the Court's attention." Tr. I at 40. But after being confronted with testimony he had previously given during a deposition—testimony to the effect that he had received a copy of the

Assignment and that it had been filed in 2012 in a lawsuit pending in Tennessee (not involving Bavelis) in which Goldstein served as counsel for Doukas—Goldstein admitted that he had possession of a copy of the Assignment before Bavelis's counsel made the Court aware of it. Tr. I at 42–43, 83–84.

knowledge, Bavelis could have successfully argued that Quick Capital had no standing to file the documents. In addition, as explained below, many of the arguments that Doukas and Quick Capital made were directly contrary to Socal's interest as a creditor, and Socal almost certainly would not have made those arguments if it had been represented by counsel who was acting solely in its interest. In other words, as a result of the Respondents' deceitfulness during the discovery process, Bavelis incurred attorneys' fees and expenses responding to arguments that Socal would not have made if it had been represented by an attorney who had not also been representing Doukas and Quick Capital. The Respondents' bad-faith conduct during discovery therefore harmed Bavelis.

### C. The Respondents' False Representations in Documents Filed with the Court

The Respondents filed multiple documents in which they failed to disclose the Assignment and even went so far as to make the false representation that Quick Capital was a creditor of the bankruptcy estate post–Assignment:

- Doukas was acting both in his personal capacity and on behalf of Quick Capital in July 2011 when he filed an objection (the "Disclosure Statement Objection") (Ex. 224) (Doc. 243) to Bavelis's disclosure statement for his first amended plan of reorganization. In the Disclosure Statement Objection, Doukas and Quick Capital represented that Quick Capital was the "holder of a secured claim against the Debtor." Ex. 224 (Doc. 243) at 1. This representation was untrue, and Goldstein concedes that it was untrue. Tr. I at 65.

- Quick Capital filed a motion seeking the appointment of a Chapter 11 trustee in November 2011 (the "Trustee Motion") in which it stated that it was "a secured claim creditor." Ex. 227 (Doc. 280) at 1. As he must, Goldstein admits that this statement was false. Tr. I at 65–66.

- Also in November 2011, Quick Capital filed an objection to the Court's order extending Bavelis's exclusive period to solicit acceptances of his plan of reorganization (the "Exclusivity Extension Objection"), stating "[a]s a Creditor, Quick Capital desires to file a Plan." Ex. 229 (Doc. 282) at 12. Of course, Quick Capital was not a creditor at the time of that filing either.

- After Bavelis filed a motion requesting that the Court bifurcate his objection to Quick Capital's claim and hear that objection before holding a trial on the other aspects of his complaint, Quick Capital filed a response in November 2011 that repeatedly referred to the claim as belonging to Quick Capital. Ex. 228 (Adv. Doc. 139).

- Quick Capital filed objections in November 2011 to the proofs of claim of certain third parties (Exs. 230 & 231) (Docs. 283 & 294). In doing so, Quick Capital represented that it was a creditor, a representation that Goldstein concedes was untrue. Tr. I at 67–68, 70.

- In February 2012, Quick Capital filed a motion for summary judgment (Ex. 236) (Adv. Doc. 170) in which it referred to the "secured claim of Quick Capital" and requested summary judgment in favor of itself, not Socal.

Goldstein admits that he improperly failed to identify Socal as the creditor in all of these documents. Adv. Doc. 676 at 4. And Doukas shares the blame for this failure. He received copies of all of the documents listed above from Goldstein. Tr. I at 59, 70–75. Further, Doukas was the

principal of Quick Capital, and one of the documents was expressly filed by Goldstein on behalf of Doukas in his personal capacity. In addition, Doukas conceded that he has never asserted that any of the actions Goldstein undertook on his behalf were unauthorized. During a hearing on March 26, 2014, Doukas stated "no" in response to the question whether "Goldstein, to your knowledge, [took] any action on your behalf that after the fact that you said: 'Oh, you weren't supposed to do that. You weren't authorized to say that'?" Tr. II at 19–20.[6]

Additional evidence demonstrates that Doukas actively participated in the concealment of the Assignment. Along with Goldstein, Doukas personally participated in a full-day settlement conference with Bavelis at the office of Bavelis's counsel in January 2012 for the purported purpose of resolving Bavelis's objection to the Claim (the "Claim Negotiations"). Tr. I at 161–65. At no point during the all-day settlement conference did Doukas or Goldstein disclose the Assignment. Tr. I at 161–62. Doukas also testified over the course of the four-day Claim Objection Hearing and did so without once mentioning Socal's purchase of the Claim even though he specifically referenced Socal's purchase of the claim held by IBB. It is inconceivable that Doukas would have failed to disclose the Assignment during the lengthy Claim Negotiations and the four-day Claim Objection Hearing unless he was fully complicit in the effort to keep Bavelis and the Court from becoming aware of it.

## D. The Conflicting Interests of Socal and Doukas/Quick Capital

According to the Respondents, Goldstein could have taken each of the documents discussed above, deleted any references to Doukas and Quick Capital, inserted "Socal" instead and then filed the documents on Socal's behalf. Adv. Doc. 366 at 5; Adv. Doc. 676 at 5, 8. In essence, the Respondents contend that Bavelis—and more importantly, the Court—should view this as a case of "no harm, no foul," because Socal would have conducted itself in Bavelis's Chapter 11 case in exactly the same manner that Doukas and Quick Capital did. But this argument will not wash. For even if the interests of Doukas/Quick Capital and Socal truly were identical, that would in no way justify the Respondents' lies to Bavelis and the Court.

Moreover, this argument fails because it ignores a critical fact that came to light during the Show Cause Hearing: Rather than being aligned, Socal's interest in Bavelis's bankruptcy and the interests of Doukas and Quick Capital were not the same.[7] Socal's only interest in Bavelis's

---

6. Doukas testified during the Show Cause Hearing that "Goldstein was doing a lot of things, you know, by himself. I was not—I didn't know a lot of times what he was doing on the legal work. I didn't have a clue." Tr. II at 19. This testimony in no way establishes that Goldstein was unauthorized to act on Doukas's behalf on any particular matter. And to the extent that Doukas intended the testimony to suggest that he did not authorize Goldstein to do all that he did on behalf of Doukas and Quick Capital, the Court points out once again that it finds Doukas's testimony to be completely lacking in credibility. *See Bavelis I*, 490 B.R. at 293–94 n.11 (describing Doukas's testimony as having "a chameleon-like quality, shifting as necessary to suit his purposes at a given time").

7. In its Second Order Directing Gary A. Goldstein to Appear and Show Cause Why His Admission *Pro Hac Vice* Should Not Be Revoked, the Court stated that "[i]t is impossible to ever know whether Socal would have taken the same positions as were taken by Quick Capital." Adv. Doc. 346 at 9. But that was before the evidence presented during the Show Cause Hearing made clear that Doukas's and Quick Capital's interests were inconsistent with Socal's interests as a creditor.

bankruptcy case was in receiving the highest possible distribution on account of the Claim. By contrast, Quick Capital had no claim post-Assignment, and Doukas did not even file a proof of claim. Standing to receive no distribution from Bavelis's bankruptcy estate, Doukas and Quick Capital instead took three stances that conflicted with Socal's interests as a creditor.

First, Doukas asserted ownership interests in assets that Bavelis was attempting to recover—assets that might have been used to repay creditors such as Socal. By way of background, Doukas was the sole owner of R.P.M. Recoveries Inc. ("R.P.M.") and Nemesis of L.I. Corp. ("Nemesis"), entities that were also represented by Goldstein. Tr. I at 27. Before the Petition Date, Doukas had used R.P.M. and Nemesis to obtain assignments from Bavelis or Bavelis-owned entities of the membership interests in the following four limited liability companies: (1) George Real Estate Holdings, LLC; (2) FLOVEST, LLC; (3) BMAQ, LLC; and (4) GMAQ, LLC. The Court will refer to George Real Estate, FLOVEST, BMAQ, and GMAQ collectively as the LLCs.[8] Bavelis commenced this adversary proceeding in part to ask the Court to unwind the transfers of the membership interests in the LLCs. As the owner of R.P.M. and Nemesis, Doukas had an obvious motivation to attempt to thwart those efforts so that his companies would retain the membership interests in the LLCs. In fact, Doukas strenuously contended that the transfers should not be unwound. But Doukas's position in this regard was in direct conflict with the financial interests of Bavelis's creditors. The creditors' interests would have been served if Bavelis were to prevail in his attempt to unwind the transfers, because in that event the value of Bavelis's direct or indirect interests in the LLCs might become available to satisfy creditors' claims. Thus, there was an obvious divergence of interests between noncreditors Doukas and Quick Capital and creditor Socal relating to the LLCs.

Second, Doukas, Quick Capital and his other companies also were attempting to derail Bavelis's claims against them in the adversary proceeding for monetary damages. To avoid paying damages, Doukas and his companies would have to successfully defend against Bavelis's claims, or else obtain the appointment of a Chapter 11 trustee who might dismiss or settle the adversary proceeding in a manner favorable to them. But given that a judgment in favor of Bavelis would constitute another source of funds for the repayment of creditors, Socal and other creditors had an interest in Bavelis succeeding on his claims against Doukas and his companies.

Third, apart from the adversary proceeding, Doukas was working to maximize the claim of the Federal Deposit Insurance Corporation (the "FDIC") in a way that could have significantly diluted the recovery of Socal and other creditors of Bavelis. Before the Petition Date, Doukas filed a complaint with the Federal Reserve against Sterling Bank of Palm Beach County, Florida, a bank Bavelis had been a director of before it failed and was taken over by the FDIC. *Bavelis I*, 490 B.R. at 266, 307. In its capacity as the receiver for Sterling Bank, the FDIC filed a proof of claim in Bavelis's bankruptcy case stating that it was acting "to protect the insured depositors and creditors of failed depository institutions." Claim 52–2. Perhaps Doukas believed that his complaint made him a creditor of Sterling Bank and that he therefore would benefit personally from

---

8. Either Bavelis and his business partner, Mahammad A. Qureshi, or companies affiliated with them, owned the membership interests in all of the LLCs.

the FDIC's receiving a large recovery from Bavelis. Or perhaps Doukas wanted the FDIC to support Quick Capital's request for the appointment of a Chapter 11 trustee so that Doukas could then attempt to persuade the trustee to either dismiss the adversary proceeding against him and his companies or settle it on terms favorable to them. Regardless of his motivation, Doukas permitted Goldstein to engage in unrelenting efforts to increase the amount of the FDIC's allowed claim, Ex. 279, all to the potential detriment of Socal and other creditors. It would not have been in Socal's interest as a creditor of the Bavelis bankruptcy estate to argue that the FDIC had a multi-million dollar claim that could significantly dilute its own recovery. This created yet another conflict between Socal on the one hand and Doukas and Quick Capital on the other.

Goldstein contends that Socal gave its consent to the actions he took on behalf of Doukas and his companies in the Bavelis bankruptcy case. Tr. I at 55. Of course, any consent that Socal gave would in no way justify the Respondents' lying to Bavelis and the Court. Moreover, each of the conflicting interests discussed above existed when Goldstein began representing Socal, yet Goldstein conceded that he made no disclosure of these conflicts to Socal at the time he filed the documents in the name of Doukas and Quick Capital. Tr. I. at 138–40, 145–46. Thus, even if it is true, as Goldstein contends, that Socal consented to the actions he took in the Bavelis bankruptcy case, Socal could not have given informed consent.

Motivated by his own financial interests, Doukas (and through him, Quick Capital) took several positions in this case that ran directly counter to Socal's interests as a creditor. For instance, in the Disclosure Statement Objection, Doukas and Quick Capital maintained that Bavelis should disclose whether Bavelis's execution of the Note and the Security Agreement was part of "a scheme on [his] part to divest himself of assets in order to defraud his other creditors." Ex. 224 (Doc. 243) at 6. If the fraudulent scheme suggested by Doukas and Quick Capital existed, it would have provided a basis for invalidating the Note as a fraudulently incurred obligation and unwinding the Security Agreement as a fraudulent transfer, thereby depriving Socal of any recovery on the Claim. Objecting to Bavelis's disclosure statement based on the suggestion that the Quick Capital loan documents were fraudulent are hardly steps that Socal—a creditor seeking payment on the Note—would have had an interest in taking.

Furthermore, Quick Capital argued for the appointment of a Chapter 11 trustee in part so that the trustee could reassess the merits of Bavelis's request to avoid the transfer of the membership interests in the LLCs. Ex. 227 (Doc. 280) at 10. But Socal's interests would have been served if Bavelis were to prevail in his attempt to unwind the transfers, because in that event the value of Bavelis's direct or indirect interests in the LLCs might become available to satisfy the claims of Socal and other creditors.

Doukas and Quick Capital took other positions that clashed with the financial interest of Socal. They stated in the Disclosure Statement Objection that "Federal Regulators closed Sterling Bank; that the losses sustained by [the] FDIC exceeded $50,000,000 ... and that the breach of fiduciary duty and gross negligence claims of the FDIC [against Bavelis] are non-dischargeable." Ex. 224 (Doc. 243) at 4. Quick Capital made essentially the same allegations in its Exclusivity Extension Objection, Ex. 229 (Doc. 282) at 5, and the Trustee Motion, where Quick Capital even alleged that Bavelis had "defrauded the

FDIC," Ex. 227 (Doc. 280) at 14. The FDIC was not active in the Bavelis bankruptcy case at the time the Respondents filed these documents. Tr. I at 164. Goldstein, however, heavily lobbied the FDIC's counsel to maximize the FDIC's claim and to persuade it to join the Exclusivity Extension Objection and the Trustee Motion. Ex. 279; Tr. I at 93–98. After several unsuccessful attempts at persuading the FDIC to do so, Goldstein went so far as to state to the FDIC's counsel that "the failure to act by the FDIC would be gross negligence and it would be just as complicit in the loss of the public's money as was George Bavelis." Ex. 279 at 6.[9] Arguing that the FDIC had a $50 million nondischargeable fraud claim and strongly encouraging the FDIC to pursue the claim was inimical to the interests of Socal, whose recovery could have been significantly diluted by such a large claim.

For their part, Doukas and Quick Capital were merely defendants in the adversary proceeding, a status that afforded them no standing to assert the arguments they made.[10] And it would not have been in Socal's interest to make arguments that would have only benefitted Doukas and Quick Capital. Thus, if the Respondents had been truthful with Bavelis and the Court about the Assignment, Bavelis would not have been forced to incur the attorneys' fees required to respond to arguments that served only the interests of Doukas and Quick Capital.

## E. The Claim Negotiations

According to his bankruptcy counsel, Bavelis "was committed to getting out as quickly as possible of Chapter 11," so he was willing to attempt to resolve the dispute over the Claim "even though he believed that it was a claim that should have ultimately been disallowed." Tr. I at 166. Unfortunately, the Respondents' failure to disclose the Assignment thwarted Bavelis's efforts to reach a negotiated resolution of the Claim and caused him to incur unnecessary attorneys' fees engaging in those efforts.

As previously stated, the Claim Negotiations included a full-day settlement conference convened at the offices of Bavelis's litigation counsel in January 2012. Tr. I at 144. The Assignment of the Claim to Socal had taken place nine months earlier. Despite this, neither of the principals of Socal—Lennon Stravato and Ian Chen—attended the conference. Instead, only Doukas and Goldstein came to negotiate with Bavelis and his counsel. Conceding that neither Doukas nor Quick Capital had

---

**9.** A week after Goldstein made this allegation against the FDIC, it joined in the Trustee Motion, Doc. 317, but then withdrew the joinder a month later, Doc. 341. The FDIC and Bavelis ultimately entered into a Court-approved settlement agreement under which Bavelis's bankruptcy estate paid no funds to the FDIC. See Docs. 680, 690. Goldstein conceded that First Southern Bank, which also filed a motion for the appointment of a Chapter 11 trustee, did so only after receiving encouragement from him. Tr. I at 98–99. First Southern Bank ultimately declined to pursue its motion.

**10.** See In re E.S. Bankest, L.C., 321 B.R. 590, 596–98 (Bankr. S.D. Fla. 2005) (holding that the movant's status as a defendant in an adversary proceeding did not make it a party in interest with standing to seek conversion or the appointment of a trustee because "[i]ts interest in defending itself in the Adversary Proceeding ... is antithetical to the interests of the legitimate creditors of the Debtor who have a direct interest in *maximizing* any recovery from [the defendant]"); *see also Moran v. LTV Steel Co. (In re LTV Steel Co.)*, 560 F.3d 449, 453 (6th Cir. 2009) ("[W]e are aware of no court that has held that the burden of defending a lawsuit, however onerous or unpleasant, is the sort of direct and immediate harm that makes a party 'aggrieved' so as to confer standing in a bankruptcy appeal.").

any interest in the Claim at that point, the Respondents contend that Doukas was participating in the Claim Negotiations as Socal's representative and that Goldstein was there as Socal's counsel. Adv. Doc. 677 at 50–51. But Goldstein admitted during the Show Cause Hearing that Doukas's interests were adverse to Socal's interest as a creditor, that the adversity was apparent at the time he was retained by Socal, and that he did not disclose the conflict of interest to Socal at the time the engagement began. Tr. I at 140–41, 145–46.[11]

The extent of the adversity between Doukas and Socal meant that the Claim Negotiations between Doukas and Bavelis had no chance of resolving the Claim. Doukas's goal in engaging in the Claim Negotiations with Bavelis would have been to retain the membership interests in one or more of the LLCs or to receive compensation for the transfer of those interests back to Bavelis and his affiliates. A settlement proposal that Goldstein sent to Bavelis's counsel following the conference reveals Doukas's purpose. The Claim Negotiations having failed, Goldstein sent the settlement proposal to Bavelis's counsel the next morning, stating that during "the 5 hour trip back to South Florida Ted [Doukas] and I had some time to really consider how to structure a settlement that may work for both of the parties ...." Ex. K at 1. Goldstein sent a blind carbon copy of the proposal to Doukas, but did not copy Lennon Stravato or anyone else affiliated with Socal. Tr. I at 149. When asked why he did not copy Stravato, Goldstein said only: "I don't know. I don't know." Id.

Under the first paragraph of the settlement proposed by Goldstein and Doukas, Bavelis would have paid $2 million to Quick Capital, and under the second paragraph, Doukas's company Nemesis would have assigned its interests in three of the four LLCs—GMAQ, BMAQ and George Real Estate—back to Bavelis or his affiliates. Ex. K at 1. But Doukas would "keep" Nemesis's membership interest in FLOVEST. Id. at 1.[12] Of course, disclosing the Assignment would have reduced the leverage that Doukas was always seeking to maintain.[13] If Doukas had disclosed the Assignment, it would have been apparent to Bavelis that Doukas had nothing left to trade, and there would have been no rea-

11. Goldstein contends that he made Lennon Stravato aware shortly before the Claim Negotiations commenced of the adversity that existed between Socal and Doukas. Tr. I at 140–41, 145–46. Yet while admitting that "[n]ormally you would have a written record of a conflict [disclosure]," Tr. I at 148, Goldstein conceded that there was no documentary evidence establishing that he disclosed the conflict to Stravato. Tr. I at 138–39. And while Goldstein could have called Stravato as a witness to confirm his purported disclosure, he did not do so.

12. During his testimony, Goldstein contended that Doukas intended to retain an interest in FLOVEST merely to help Bavelis negotiate a settlement with one of Bavelis's creditors, BB & T Bank. Tr. I at 151–52. But anyone familiar with the Bavelis bankruptcy case and the Court's factual findings in *Bavelis I* would immediately realize that Goldstein's testimony in this regard borders on the preposterous. In *Bavelis I*, which was issued before Goldstein testified during the Show Cause Hearing, the Court concluded that "Doukas never intended ... to keep any of the promises he made to Mr. Bavelis" before the Petition Date—including that Doukas would negotiate deals on his behalf—but that he "instead intended to take advantage of Mr. Bavelis and deprive him of his assets." *Bavelis I*, 490 B.R. at 318. It is therefore impossible to believe Goldstein's testimony that Doukas wanted to retain an interest in FLOVEST simply to assist Bavelis by negotiating a deal on his behalf.

13. *See Bavelis I*, 490 B.R. at 268 (Doukas testifying that his approach to business was "creat[ing] a leverage that you can negotiate so it will make money").

son for Bavelis to negotiate with Doukas regarding the Claim.

There is another reason that the failure to disclose the Assignment caused Bavelis to incur attorneys' fees unnecessarily. If the Respondents had disclosed the Assignment, Bavelis and his counsel would not have engaged in the Claim Negotiations with Doukas in the first place. After all, before the Petition Date, Doukas had led Bavelis to believe that he was negotiating with Bavelis's business partner, Qureshi, in order to resolve the disputes over the LLCs in a manner favorable to Bavelis, but Doukas instead perpetrated a scheme designed to deprive Bavelis of substantially all of his assets. *See Bavelis I*, 490 B.R. at 265, 275. Thus, Bavelis was well aware of the deception in which Doukas was inclined to engage when purportedly conducting negotiations on someone else's behalf. Given this, if the Respondents had disclosed the Assignment, Bavelis rightly would have resisted any suggestion that he negotiate with Doukas with respect to the Claim, and Bavelis would not have expended resources conducting the Claim Negotiations with Doukas. For all these reasons, the Respondents should compensate Bavelis for the fees and expenses his counsel incurred preparing for and participating in the Claim Negotiations.

## F. The Respondents' Duplicity Comes to Light.

More than two years after Doukas executed the Assignment—and following the four-day Claim Objection Hearing at which the Respondents again failed to disclose it—Bavelis's counsel discovered the Assignment and brought it to the attention of the Court. Bavelis and his attorneys learned of the Assignment in July 2013 when they obtained documents "relating to other litigation [in Tennessee] involving Doukas-related entities" in which Bavelis was not involved. Ex. 275 at 3; Tr. I at 158–59. Counsel for Bavelis then made the Court aware of the Assignment during a status conference in early August 2013. Ex. 241; Tr. I at 160. After Bavelis's counsel brought the Assignment to the Court's attention, Goldstein claimed that he had previously made Bavelis's counsel aware of it, an assertion denied by Bavelis's bankruptcy attorney, Stovall. Tr. I at 160. Finding Stovall's testimony to be highly credible—and, by contrast, Goldstein's mendacity to be rivaled only by Doukas's—the Court concludes that Goldstein never made Bavelis or his counsel aware of the Assignment. That is, Goldstein lied during the status conference when he represented that he previously had disclosed the Assignment to Bavelis's counsel.

As a result of the concealment of the Assignment, Bavelis was required to obtain an order substituting Socal for Quick Capital as the real party in interest with respect to Bavelis's objection to the Claim.[14] To do so, Bavelis filed a motion requesting that Socal be joined as a party defendant, Adv. Doc. 316, and the Court entered an agreed order joining Socal as a defendant and certifying the matter for immediate appeal under Civil Rule 54(b). Adv. Doc. 328. In short, once Bavelis learned about the Assignment, his counsel incurred additional attorneys' fees and expenses taking steps to address the manner in which the concealment of the Assignment had muddled and disrupted the litigation over the Claim.

---

14. After the Court issued *Bavelis I*, Doukas and Quick Capital appealed, and the Bankruptcy Appellate Panel of the Sixth Circuit entered an order holding that it lacked appellate jurisdiction to consider the appeal of *Bavelis I* absent a certification from this Court under Federal Rule of Civil Procedure 54(b).

## V. Conclusions of Law

### A. Section 105(a) and the Court's Inherent Authority

Under § 105(a) of the Bankruptcy Code, a bankruptcy court may "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). This section grants "broad authority ... to bankruptcy judges to take any action that is necessary or appropriate to prevent an abuse of process." *Marrama v. Citizens Bank*, 549 U.S. 365, 375, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). In addition, the United States Supreme Court has recognized the inherent authority of federal courts to sanction conduct that "abuses the judicial process." *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).[15]

In *Chambers*, the Supreme Court upheld a court's use of its inherent authority to sanction bad faith conduct in the form of "acts which degrade the judicial system," including "misleading and lying to the court." *Chambers*, 501 U.S. at 42, 111 S.Ct. 2123; *see also Graham v. Dallas Indep. Sch. Dist.*, No. 3:04–CV–2461–B, 2006 WL 507944, at *4 (N.D. Tex. Jan. 10, 2006) ("It goes without saying that lying to the court constitutes bad faith." (citing *Chambers*, 501 U.S. at 42, 46, 50–51, 111 S.Ct. 2123)). For example, knowingly misrepresenting facts in a motion or other document is indicative of bad faith. *See Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 146 (2d Cir. 2012). A party also "shows bad faith by delaying or disrupting the litigation." *Chambers*, 501 U.S. at 46, 111 S.Ct. 2123 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n.14, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)). And withholding material evidence disrupts and delays litigation. *See First Bank of Marietta*, 307 F.3d at 525 (finding bad faith where plaintiff withheld a document that it knew undermined its cause of action); *accord Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011).[16]

**15.** This authority is not unlimited, and the Court must "exercise caution in invoking its inherent power" so as to "comply with the mandates of due process ....." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123. The Respondents initially contended that sanctions could be imposed against them only after the Debtor commenced an adversary proceeding seeking sanctions. *See* Adv. Doc. 366 at 2; Adv. Doc. 367 at 1. But this contention is contrary to the law of this circuit. *See, e.g., Royal Manor*, 652 Fed.Appx. at 339 (affirming sanctions imposed under § 105(a), the inherent authority of the sanctioning bankruptcy court, and 28 U.S.C. § 1927 upon motion and show cause order). Furthermore, even if an adversary proceeding had been required, the Respondents were not prejudiced by proceeding on motion and a show cause order, because they received ample notice of the Show Cause Hearing and were afforded all of the opportunities for discovery and the other procedural protections that are available in an adversary proceeding. *See Tully Constr. Co. v. Cannonsburg Envtl. Assocs., Ltd. (In re Cannonsburg Envtl. Assocs., Ltd.)*, 72 F.3d 1260, 1264–65 (6th Cir. 1996); *Hines v. Hines ( In re Hines)*, No. 05–8065, 2006 WL 3956493, at *5 (6th Cir. BAP 2006).

**16.** Doukas and Quick Capital cite a three-part test for bad faith that is used when a frivolous lawsuit is filed, Adv. Doc. 366 at 3 n.6, and Goldstein also alludes to this test when he contends that the Trustee Motion and other documents he filed in Doukas's and Quick Capital's name were not "frivolous," Adv. Doc. 676 at 3. Under this test, bad faith exists if "[1] ... the claims advanced were meritless, [2] ... counsel knew or should have known this, and [3] ... the motive for filing the suit was for an improper purpose." *Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 301–02 (6th Cir. 2016) (quoting *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 524 (6th Cir. 2002)). The test, however, "is not applicable to this case, which involves a motion for sanctions against a stonewalling [and deceptive] attorney and [his clients]." *Id.* at 302.

■ The Respondents filed multiple documents with the Court stating that Quick Capital was a creditor when they knew that this contention was false. In addition, Goldstein made yet other misrepresentations when he repeatedly took the position that he did not intend to mislead Bavelis or the Court. As explained above, the evidence definitively demonstrates that Goldstein and the other Respondents intentionally misrepresented Quick Capital's creditor status in filings with the Court for the purpose of misleading Bavelis about the identity of the creditor that held the Claim. Moreover, the evidence shows that the Respondents' deceit enabled noncreditors Doukas and Quick Capital to take positions—including that a Chapter 11 trustee should be appointed—designed to derail Bavelis's claims against Doukas and his companies. Of course, misleading the Court was part and parcel of the Respondents' strategy, because telling the truth to the Court would have revealed it to Bavelis.

By failing to produce the Assignment and stating that no responsive documents existed even though the Assignment was clearly responsive, the Respondents disrupted and delayed the course of the Bavelis bankruptcy case and the adversary proceeding. If the Assignment had been produced in October 2011 when Bavelis made the first document request that should have elicited it, then Quick Capital would not have been able to pursue the Trustee Motion. Furthermore, Bavelis would not have negotiated with Doukas regarding the objection to the Claim, which instead may well have been resolved through negotiations with Socal. The Respondents also delayed and disrupted Bavelis's bankruptcy case by making argu-

ments that Doukas and Quick Capital, as noncreditors, lacked standing to make. *See In re Royal Manor Mgmt., Inc.,* No. 08–50421, 2013 WL 6229151, at *3 (Bankr. N.D. Ohio Dec. 2, 2013) (finding that the filing of documents while lacking standing to do so delayed the proceedings), *aff'd,* 525 B.R. 338 (6th Cir. BAP 2015), *aff'd,* 652 Fed.Appx. 330 (6th Cir. 2016). Because the Respondents knew about the existence of the Assignment "when [they] made [their] misrepresentations to the [C]ourt" and Bavelis, their "repeated misrepresentations [are not] innocent," but instead show that they intentionally deceived Bavelis and the Court. *Williamson,* 826 F.3d at 303. In sum, the Court finds by clear and convincing evidence that the Respondents engaged in egregious, bad-faith conduct in multiple ways.[17]

## B.  Section 1927 of the Judicial Code

In addition to its inherent authority and its authority under § 105(a), the Court also has the authority to sanction Goldstein under 28 U.S.C. § 1927. *See Royal Manor,* 652 Fed.Appx. at 341–42. Section 1927 of the Judicial Code states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

■ Before his admission *pro hac vice* was revoked, Goldstein was an attorney admitted to practice before the Court. "Section 1927 sanctions are warranted

---

17.  Courts have used the clear and convincing evidence standard when exercising their inherent authority to sanction parties for bad

faith. *See, e.g., Ali v. Tolbert,* 636 F.3d 622, 627 (D.C. Cir. 2011).

when an attorney objectively 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Royal Manor*, 652 Fed.Appx. at 337 (quoting *Red Carpet Studios v. Sater*, 465 F.3d 642, 646 (6th Cir. 2007)). Goldstein owed a duty of candor to the Court, and he objectively fell far short of that obligation each time he knowingly misrepresented Quick Capital's status as a creditor in documents filed with the Court. *See Red Carpet Studios*, 465 F.3d at 646 (holding that attorney's "failure to join a necessary party and the several attendant misrepresentations" constituted "vexatious conduct"). In addition, failing to produce the Assignment and making misrepresentations to Bavelis about its existence in the responses to discovery he prepared on behalf of his clients also constitute unreasonable and vexatious litigation tactics that warrant the imposition .of sanctions under § 1927. *See Jones v. Ill. Central R.R. Co.*, 617 F.3d 843, 854–55 (6th Cir. 2010) (affirming district court's imposition of sanction under § 1927 for attorney's withholding responsive documents and making misrepresentations regarding their existence).

As a result of Goldstein's misconduct, Bavelis incurred additional attorneys' fees and expenses. And because his conduct "multiplie[d] the proceedings" in Bavelis's bankruptcy case and this adversary proceeding "unreasonably and vexatiously," Goldstein will be required to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct," 28 U.S.C. § 1927, in an amount to be determined. The amount "may include ... the costs, expenses, and attorneys' fees that [Bavelis] incurred in obtaining the award." *In re Royal Manor Mgmt., Inc.*, 525 B.R. 338, 366 (6th Cir. BAP 2015) (quoting *Norelus v. Denny's,*

*Inc.*, 628 F.3d 1270, 1298 (11th Cir. 2010)), *aff'd*, 652 Fed.Appx. 330.

## C. The Respondents' Arguments Are Meritless.

In an attempt to avoid sanctions for their bad faith conduct, the Respondents take a scattershot approach: They seek to escape liability by raising a plethora of arguments. But as explained below, the Respondents' arguments simply do not hold water.

■ The Respondents first argue that they cannot be held liable for withholding documents and lying during discovery because Bavelis did not seek discovery sanctions under Rule 7037 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 7037"). Adv. Doc. 366 at 2; Adv. Doc. 367 at 1. But "[a] court's inherent authority to impose sanctions is not displaced by sanctions schemes available through statutes or court rules; rather, such inherent authority provides an independent basis for sanctioning bad-faith conduct in litigation." *Royal Manor*, 652 Fed.Appx. at 342 (citing *Chambers*, 501 U.S. at 46, 50, 111 S.Ct. 2123 and *First Bank of Marietta*, 307 F.3d at 518 n.14). And "*Chambers* should be read broadly to permit the [trial] court to resort to its inherent authority to sanction bad-faith conduct, even if the court has not expressly considered whether such conduct could be sanctioned under all potentially applicable rules or statutes." *First Bank of Marietta*, 307 F.3d at 514. True, a court "ordinarily should rely on the Rules rather than the inherent power." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123. "But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.*

Bankruptcy Rule 7037 is not up .to the task here. The Respondents argue that Bavelis should have sought redress under

Bankruptcy Rule 7037 by filing a motion to compel discovery, obtaining an order compelling discovery and then obtaining sanctions if Doukas and Quick Capital failed to comply with the order. Adv. Doc. 366 at 2. That process works where a party acknowledges the existence of a document, but refuses to produce it. Perhaps it even works where a party refuses to acknowledge a document's existence, but the other party knows it exists, cannot obtain it except through discovery, and seeks to obtain sanctions for the failure to turn it over. But even a moment's thought should reveal that Bankruptcy Rule 7037 is inadequate to address a situation where, as here, the party being sanctioned not only failed to produce a document, but also made misrepresentations both to opposing counsel and the Court that were designed to conceal its existence. A motion to compel makes no sense where the document that should have been produced has been obtained from another source. Under these circumstances, it is appropriate to impose sanctions for the bad faith inherent in misleading both Bavelis and the Court. *See Williamson v. Recovery Ltd. P'ship*, No. 2:06–CV–00292, 2014 WL 1884401, at *10 (S.D. Ohio May 9, 2014) ("[The] request for sanctions targets ... *conduct* in misrepresenting to the Court the existence and location of the missing inventories. This is not a case where the Court 'ha[s] ... issued an order to redress a discovery violation committed by the defendants' from which [the Plaintiff] is able to seek relief under Rule 37 for Defendants' failure to comply."), *aff'd*, 826 F.3d 297 (6th Cir. 2016).

The Respondents next contend that Goldstein's joint representation of Doukas, Quick Capital and Socal negates the Respondents' liability because "a timely disclosure of the Assignment likely would simply have resulted in Debtor litigating the[ ] same issues with SoCal." Adv. Doc.

366 at 5 & n.9 (stating that "[p]ursuant to the terms of the Assignment, Quick Capital is required to cooperate in the defense of the assigned claim and, accordingly, would have been required to continue [to] participate in this litigation regardless of when the Assignment was ultimately disclosed"); *see also* Adv. Doc. 367 at 1; Adv. Doc. 676 at 4–5; Adv. Doc. 677 at 50–52. This argument rings hollow for several reasons. To begin with, even if it were true that Socal would have taken the same approach to the bankruptcy case and adversary proceeding that Quick Capital took, this would not justify lying to Bavelis and the Court. Moreover, as the Court found above, given their conflicting financial interests, it is highly unlikely that Socal would have conducted itself in the manner Quick Capital did. Socal never filed a motion for the appointment of a Chapter 11 trustee, and. Socal would not have made many of the arguments on which Doukas and Quick Capital relied in the other documents they filed. In addition, Goldstein made those arguments on behalf of Doukas and Quick Capital after failing to disclose to Socal the adversity that existed between it and Doukas and Quick Capital. For his part, Doukas knew about Goldstein's joint representation, Tr. I at 59, and, unlike Socal, Doukas no doubt was aware of how his and Quick Capital's interests were adverse to Socal's interests. Despite his knowledge of the adversity, Doukas permitted Goldstein to continue the joint representation and to take positions both in proceedings before the Court and in negotiations with Bavelis that were contrary to Socal's interest as a creditor. For all these reasons, Goldstein's joint representation of Doukas, Quick Capital and Socal provides no basis for the Respondents to escape the imposition of sanctions for misleading Bavelis during discovery

and lying to the Court on multiple occasions.

The Respondents also argue that, because the FDIC joined the Trustee Motion and First Southern Bank filed its own motion for the appointment of a Chapter 11 trustee, the Trustee Motion imposed no additional costs on Bavelis. Adv. Doc. 366 at 6; Adv. Doc. 367 at 1; Adv. Doc. 676 at 4. But there would have been nothing for the FDIC to join if Quick Capital had not filed the Trustee Motion in the first place, and the FDIC in fact filed its joinder only after its counsel received strenuous urging to do so from Goldstein. As for First Southern Bank, Goldstein conceded that it likewise filed its motion for the appointment of a trustee only after he encouraged its counsel to do so. Tr. I at 98–99. Like other parties in interest, the FDIC and First Southern Bank were operating under the false pretense created by the Respondents that Quick Capital had standing to seek the appointment of a Chapter 11 trustee. Had they known the truth—and the Trustee Motion itself would have revealed the truth if the Respondents had not once again lied when they filed it—the FDIC and First Southern Bank may well have declined to seek the appointment of a Chapter 11 trustee. The FDIC's and First Southern Bank's involvement thus do nothing to absolve the Respondents from sanctions liability for filing a motion seeking the appointment of a Chapter 11 trustee that contained the false statement regarding Quick Capital's status as a creditor.

Doukas attempts to place the blame on Socal and Goldstein by arguing that Socal alone had the obligation to file a notice that the Claim had been transferred and that, as Socal's counsel, Goldstein should have taken responsibility for filing the notice. Adv. Doc. 677 at 46–49, 52. For his part, Goldstein attempts to portray his conduct merely as a failure to cause Socal

to file a notice of the Assignment, arguing that he should not be sanctioned for that error. Adv. Doc. 676 at 8–11. But the question of who had an affirmative duty to file a notice that the Claim had been assigned—or whether anyone did—is beside the point. The Respondents had a duty to refrain from lying to Bavelis and the Court, and they are being sanctioned for their misrepresentations regarding Quick Capital's creditor status, as well as for the withholding of responsive documents and lying about the existence of the Assignment in discovery, not for the failure to file a notice of the Assignment. As already discussed, the Respondents' scheme depended on Socal's following Goldstein's advice (which was uncovered in the unredacted copy of the Engagement Letter) that Socal refrain from filing a notice that the Claim had been transferred. But that in no way relieves the Respondents of liability for their own misconduct, including making misrepresentations to Bavelis and the Court.

Doukas also contends that Goldstein alone should be liable for the misrepresentations the Respondents made in the discovery responses because only he signed them. Adv. Doc. 677 at 52–53. But there are several reasons why this argument does not provide a reason to exonerate Doukas and Quick Capital from liability for failing to produce the Assignment. First, Doukas and Quick Capital retained Goldstein to represent them, and a "client, having chosen a particular attorney to represent him in a proceeding, cannot 'avoid the consequences of the acts or omissions of this freely selected agent. ...' " *McCurry v. Adventist Health Sys./Sunbelt, Inc.*, 298 F.3d 586, 595 (6th Cir. 2002) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)); *see also Merritt v. Int'l Brotherhood of Boilermakers*, 649 F.2d 1013, 1091 (5th Cir. 1981)

(rejecting parties' argument that only their attorneys should be liable for opposing counsel's fees incurred in filing a motion to compel where "nothing in the record indicate[d] that [their] attorneys ... were acting outside the scope of the authority delegated to them "and there thus was no reason not to apply "the general rule that a party is bound by the actions of his attorney"). Second, Goldstein testified that he typically would have provided copies of the discovery requests and the discovery responses to Doukas, and Doukas did not deny receiving them. Third, the duration and extent of Doukas's and Quick Capital's noncompliance with their obligations to respond honestly to Bavelis's discovery requests leads the Court to conclude that they deliberately chose not to produce the Assignment. In *Technology Recycling Corp. v. City of Taylor*, 186 Fed.Appx. 624, 633 (6th Cir. 2006), the plaintiffs argued that they should not be held liable for their failure to comply with a discovery order requiring the production of documents given that their attorney had just recently been retained. The Sixth Circuit rejected their argument because the "duration and extent of plaintiffs' noncompliance with discovery orders ... reasonably led the district court to believe that plaintiffs were able to produce the materials sought but willfully and in bad faith chose not to do so." *Tech. Recycling Corp.*, 186 Fed.Appx. at 633. Fourth, other evidence demonstrates that Doukas (and through him, Quick Capital) actively participated in the efforts to conceal the Assignment. For example, Doukas kept quiet about the Assignment during a full day of negotiations with Bavelis and the four-day Claim Objection Hearing, even though mentioning the Assignment at some point during the negotiations and the hearing would have been the natural thing to do—unless concealing it was the goal. For all these reasons,

Doukas and Quick Capital are just as culpable as Goldstein.

Doukas argues that Goldstein alone should be liable for the additional reason that he failed to disclose his conflict of interest. Adv. Doc. 677 at 52–53. But Goldstein's failure to disclose a conflict of interest is not a valid justification for Doukas's lying to Bavelis and the Court. Further, the evidence shows only that Goldstein failed to disclose the conflict of interest *to Socal*. Doukas knew what he and Goldstein were trying to accomplish in filing the Trustee Motion, the Disclosure Statement Objection and the Exclusivity Extension Objection—protect Doukas's interests—and he would have known that those interests were adverse to Socal's interest as a creditor. For all these reasons, the argument that Doukas and Quick Capital should be absolved from liability for sanctions because Goldstein failed to inform Socal of his conflict of interest is a nonstarter.

In addition to joining those arguments made by Doukas and Quick Capital that do not point the finger at him, Goldstein makes four additional arguments, all devoid of merit. First, Goldstein contends that "[t]here is no allegation by [Bavelis] or even the Court that anything contained in the [documents Goldstein filed in the name of Doukas and Quick Capital] was factually inaccurate"—other than the allegation that Quick Capital was a secured creditor. Adv. Doc. 676 at 3. The Court need not decide whether this contention is accurate. For even if the documents contained factually correct statements, such statements could not possibly justify representing to the Court that Quick Capital was a secured creditor when it was not.

Second, Goldstein relies on the fact that he withdrew the Trustee Motion and the other documents he filed in Doukas's and Quick Capital's name, helped Socal obtain

separate counsel, and procured Socal's consent to be bound by a final, nonappealable order in *Bavelis I.* Adv. Doc. 676 at 5–6, 11. But because Goldstein undertook his remedial efforts only after Bavelis uncovered the Assignment and brought it to the Court's attention, the efforts in no way make him any less culpable for concealing the Assignment. *See Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 583 (S.D.N.Y. 1996) (rejecting argument that sanctions should not be imposed on the defendants who "withdrew the disputed records" given that the defendants did not withdraw the documents on their own, but rather "waited until the falsity of the documents had been detected").

Third, Goldstein attempts to avoid being sanctioned by arguing that Bavelis benefitted from the Respondents' conduct in that "[t]he Bavelis estate and Mr. Bavelis personally settled the undisputed $1,280,000 IBB claim ... for $625,000 ... simply by naming SoCal as a defendant in the adversary case, and alleging improper conduct relating to the claims procedure." Adv. Doc. 676 at 7. Goldstein cites no authority for why this should absolve him of liability for his misbehavior, and there in fact is contrary authority. *See Derzack v. Cnty. of Allegheny*, 173 F.R.D. 400, 415 (W.D. Pa. 1996) ("[C]ounsel argued to the Court ... that 'this is a Godsend to the Defendants' because they will now be able to use plaintiffs' schemes and deception against them to impeach their credibility. 'Godsends' like this, litigants and the Court can do without."), *aff'd*, 118 F.3d 1575 (3d Cir. 1997). As did the district court in *Derzack*, this Court "rejects [the] clever 'spin' on the prejudice issue as pure sophistry." *Id.* Bavelis's settlement with Socal in no way serves to mitigate the Respondents' liability for their role in misleading Bavelis and the Court.

Fourth, as he has done before, Goldstein again pleads inadvertence,[18] arguing that his discovery violations and misrepresentations to Bavelis and the Court were mere mistakes and not the result of intentional misconduct on his part. Adv. Doc. 676 at 12 (proposing findings that "[t]here is nothing in the record to suggest that the filings were intentionally filed to mislead the court or [Bavelis]" and that "[a]t most they arise to a mistake."). But this argument "taxes the credulity of the credulous." *See Maryland v. King*, — U.S. —, 133 S.Ct. 1958, 1980, 186 L.Ed.2d 1 (2013) (Scalia, J., dissenting). And indeed the Court has already rejected Goldstein's innocent-mistake defense, making contrary findings—findings that were not challenged and are now final and nonappealable—in its order revoking Goldstein's *pro hac vice* admission. *See* Doc. 645 at 9 ("When viewed in isolation, Goldstein's

---

18. In connection with the proceeding in which the Court ultimately revoked his admission *pro hac vice*, Goldstein repeatedly represented to the Court that his conduct was unintentional. *See* Doc. 579 at 4 (representing to the Court during hearing that his failure to disclose the Assignment "was not done intentionally, Your Honor, to mislead the Bavelis parties or the Court"); *id.* at 6 ("I was wrong when I said it was Quick Capital who had the claim I should have said it was Socal and I apologized to the Court for that, it was my error. But it wasn't intentionally to mislead anyone, it just didn't register with me that I should do that since I was defending the claim pursuant to this agreement that required the claim to be defended."); *id.* at 11 ("It was not withheld intentionally for any nefarious reason. I mean it was a mistake in discovery but it wasn't intentional. And one other thing, Your Honor. I apologize to the Court for the time it took even for this hearing but it was not done intentionally."); Adv. Doc. 395 at 2 (stating in document filed with the Court that "[t]he filing of pleadings in the name of Quick Capital subsequent to the sale by Quick Capital of its Note to 'Socal' were not made to deceive the Court or any Party. The mistake was inadvertent [and] unintentional ....").

failure to mention the Socal Assignment in one of the five documents or two responses could conceivably have been inadvertent. But it strains credulity to assert that he inadvertently failed to mention the Socal Assignment in all seven. And it is inconceivable that he could have served as counsel during a four-day trial and failed to mention the Socal Assignment unless he intended to do so. In sum, the Court finds that the failure to disclose the Socal Assignment was intentional, despite Goldstein's assertion to the contrary.").

Goldstein's suggestion that his misbehavior "[a]t most ... arise[s] to a mistake," Adv. Doc. 676 at 12, is belied by (1) the sheer number of misrepresentations he made to Bavelis and the Court, (2) the extended period of time over which he made them, (3) the unredacted copy of the Engagement Letter—in which Goldstein counseled Socal not to disclose the Assignment and stated his belief that concealment would be strategically advantageous, and (4) Goldstein's well-established penchant for untruthfulness, as shown not only by his interaction with Bavelis and the Court, but also by his dealings with other parties in this case, most notably IBB and its counsel, Sarah Pape. In short, the record is replete with evidence that Goldstein intended to deceive Bavelis and the Court.

As already discussed, following the assignment to Socal, Goldstein filed document after document identifying Quick Capital as a secured creditor of Bavelis's bankruptcy estate. Those documents include the Disclosure Statement Objection, the Trustee Motion, the Exclusivity Extension Objection, a response to Bavelis's motion requesting that the Court bifurcate his objection to the Claim, two objections to the proofs of claim of certain third parties, and a motion for summary judgment. Again, one or two lapses by Gold-

stein might be chalked up to mistake, but not seven filings made over a two-year period (from July 2011 until Bavelis's counsel discovered the Assignment and brought it to the attention of the Court in August 2013). Then there is the smoking gun—the unredacted copy of the Engagement Letter, in which Goldstein advised Lennon Stravato (Goldstein's contact at Socal) that Socal should not file a notice of the Assignment and explained what Goldstein saw as the strategic benefits of concealing the Assignment. This also gives the lie to Goldstein's claim that his discovery violations and misrepresentations to Bavelis and the Court were merely unintentional lapses.

Finally, Goldstein's propensity for lying without reservation—made manifest by his dealings with IBB and Pape—also counsels strongly in favor of rejecting his facile suggestion that he did not act with intent to deceive. The evidence of the communications and course of dealing between Goldstein and Pape on behalf of their respective clients was offered by Bavelis's counsel in order to attempt to show that Doukas, despite his protestations to the contrary, was actually a secret principal of Socal. While the evidence adduced by Bavelis's counsel at the Show Cause hearing fell short of establishing that Doukas held an interest in Socal, it did lay bare the level of mendacity that Goldstein displayed in his communications and dealings with other parties in interest. This evidence is summarized below:

- As previously stated, Goldstein had engaged in an extended effort to encourage the FDIC to file a proof of claim in an amount that would dwarf the claims held by other creditors of Bavelis's bankruptcy estate. On December 5, 2011—the very same day on which Goldstein again goaded the FDIC to pursue its potential multi-

million claim and join the Trustee Motion and the Exclusivity Extension Objection—Goldstein sent an e-mail to Pape. Ex. 247. In his e-mail, Goldstein advised Pape that one of his clients (whom he did not identify) was interested in purchasing IBB's claim. *Id.* IBB had filed a proof of claim asserting an unsecured, nonpriority claim against the Bavelis bankruptcy estate in the amount of $1,280,950.73. Claim 24–1.

- Several days later Goldstein informed Pape, in an email dated December 14, 2011, that his client remained interested in acquiring IBB's claim. Ex. 248 at 3. Pape responded that IBB would be willing to sell its claim for 20% of its face value if the sale closed by the end of 2011 or 30% if the closing occurred in January 2012. *Id.* at 1, 3. After Goldstein made a counteroffer, IBB agreed to sell its claim for 25% of its face value ($320,237.68) if: (1) Goldstein's client, R.P.M.—one of Doukas's companies—paid a nonrefundable deposit by December 28, 2011; and (2) the closing occurred before January 31, 2012. Ex. 249 at 1.

- On January 3, 2012, Goldstein advised Pape that Doukas would "sign the agreement" (with the $320,237.68 purchase price) that evening and that the executed agreement and the deposit would be sent to her by overnight mail. Ex. 253 at 4. Pape, however, did not receive the deposit or the signed agreement the next day. In fact, Pape still had not received the deposit or the agreement a week later when she advised Goldstein that "I have lost track of how many times you have promised that it has been sent via overnight. What's the deal? Is your client serious about closing or is he just stringing my client along?" *Id.* at 2. In a separate e-mail Pape sent on January 10, 2012, she advised Goldstein that IBB would not assign its claim to R.P.M. if she failed to receive the deposit and the signed agreement by the end of the day. *Id.* at 1.

- Later in the day on January 10, 2012, Goldstein sent Pape an e-mail stating that he was attaching copies of the signed agreement and the check for the deposit. Ex. 254 at 2–3. But the agreement Goldstein attached was not the one Pape had sent with the $320,237.68 purchase price—that is, the agreement that Goldstein previously had said Doukas would sign. Instead, Goldstein sent Pape a revised agreement that reduced the purchase price to 20% of the face value of IBB's proof of claim, meaning that R.P.M. would be purchasing IBB's claim for $256,190.15 instead of the $320,237.68 set forth in the agreement that Goldstein had told Pape a week earlier Doukas would be signing. The "reason for the contractual change," according to Goldstein, was the "game changer" of the "filing by the FDIC of its claim in the amount of $30,000,000." Ex. 253 at 7.

- The FDIC indeed had filed an amended proof of claim on January 9, 2012, and in that proof of claim it asserted that the amount of its claim was "not less than $30,000,000." Claim 52–2 at 3. But the surprise that Goldstein expressed to Pape with respect to the large amount of the FDIC's proof of claim was stunningly disingenuous. After all, back in November 2011, the Disclosure Statement Objection that Goldstein filed on behalf of Doukas and Quick Capital had stated that "the losses sustained by FDIC exceeded $50,000,000 ... and that the breach of fiduciary duty and gross negligence claims of the FDIC are non-discharge-

able," Ex. 224 (Doc. 243) at 4—statements that were followed that same month by similar allegations in the Exclusivity Extension Objection and the Trustee Motion. What's more, the FDIC filed its $30 million claim on the heels of a nine-month period from April through December 2011 in which Goldstein agitated for the FDIC's filing of a multimillion dollar claim and its joinder in the Trustee Motion and the Exclusivity Extension Objection.[19]

- Pape initially responded that selling the claim for a reduced price was "not acceptable to my client," but she later advised Goldstein that IBB would "reluctantly" agree to the reduced purchase price of $256,190.15. Ex. 254 at 1–2. Goldstein and Doukas, however, were not finished with their attempts to use the FDIC's claim as leverage to reduce the price R.P.M. would pay for IBB's claim. On January 28, 2012, Goldstein sent Pape an e-mail stating that Doukas was still deciding whether he would cause R.P.M. to close on the purchase of the IBB claim, or whether Doukas would walk away from the deposits that he had paid IBB up to that point in the amount of $15,000, once again citing the large amount of the FDIC's claim as a reason to reduce the purchase price. Ex. 255 at 1. On February 6, 2012, Goldstein advised Pape that counsel for the FDIC had informed him that the FDIC "intend[s] to be active in pursuing [its] claim" and that "[t]his means a reduced percentage distribution to Bavelis [sic] unsecured creditors." Ex. 256 at 2. The Respondents had been working toward that end for close to a year, and they would have known all

along what Goldstein told Pape in that e-mail—that increasing the FDIC's claim would dilute the recovery of creditors.

- Goldstein ultimately was unsuccessful in his attempt to persuade IBB to reduce the purchase price below $256,190.15. On February 7, 2012, Pape e-mailed Goldstein, stating that "IBB respectfully declines any further renegotiation on the purchase terms" and that IBB was "prepared to take the $15,000 deposit and maintain its claim in the Bankruptcy." *Id.* at 1. The next day, Goldstein wired $241,190.15 (the $256,190.15 purchase price minus the $15,000 deposit), and Pape confirmed receipt of the funds. Exs. 257 & 258. Rather than having R.P.M. buy the claim, however, Doukas caused it to assign the purchase agreement with IBB to Socal. The assignment agreement between R.P.M. and Socal stated that Socal would purchase IBB's claim for the "agreed purchase price" and that it would "wire the claim Purchase Price to the trust account of Gary Goldstein." Ex. 259 at 6. While nothing in the record indicates the price that Socal paid, it indeed was Socal—not Doukas or one of his entities—that ultimately purchased IBB's claim. Exs. 259 & 263.

- Because the purchase agreement with IBB permitted R.P.M. to assign the agreement only "to another single purpose entity in which Ted Doukas is the principal," Ex. 252 at 7, Pape repeatedly asked Goldstein whether Doukas was a principal of Socal. *See* Exs. 260–61; *see also* Ex. 258 at 2 (Pape stating "I see that [the assign-

---

19. Indeed, Goldstein had advised the FDIC's counsel that "the failure to act by the FDIC would be gross negligence and it would be just as complicit in the loss of the public's money as was George Bavelis." Ex. 279 at 6.

ment] is to Socal Capital, LLC, which I assume is a single purpose entity in which Ted Doukas is the principal" and asking Goldstein to "[p]lease confirm"). After ignoring multiple inquiries by Pape, Goldstein responded to one of her e-mails with the following statement: "I have confirmed that Mr. Doukas is a principal." Ex. 264 at 1. Because Pape had inquired only whether Doukas was a principal of Socal, Goldstein clearly intended to leave Pape with the false impression that Doukas was a principal of Socal, and that is how Pape took his representation, as she sought no further assurances from Goldstein on this point. Ex. 246 at 27–28. When asked about this during the Show Cause Hearing, Goldstein testified that what he meant when he represented to Pape that "Doukas is a principal" was that Doukas was a principal of R.P.M. Tr. I at 116–23. Of course, Goldstein's testimony in this regard is utterly nonsensical, as Pape's inquiry clearly was made in order to obtain confirmation from Goldstein that Doukas was a principal of Socal and thus verify R.P.M.'s compliance with the terms of its purchase agreement with IBB.

The upshot is that in his dealings with IBB's counsel Goldstein displayed a breathtaking disregard for the truth. He had no hesitancy in lying to advance the interest of his clients. Though he had engaged in a lengthy lobbying campaign aimed at convincing the FDIC to file a huge claim in the Bavelis bankruptcy case, Goldstein professed surprise when the FDIC ultimately filed its $30 million claim, describing it as a "game changer." Yet, in reality, as explained above, the FDIC's filing of a $30 million claim in January 2012 certainly would have come as no surprise to the Respondents, because the filing was the intended result of their nearly year-long efforts. The FDIC claim was a "game changer" only in the sense that Goldstein saw it as potential leverage Doukas could use to reduce the purchase price of the IBB claim.[20] Nor was Goldstein above lying—or at least doing his level best to create a false impression—when it came to responding to Pape's inquiry as to whether Doukas was a principal of Socal. In sum, Goldstein's demonstrated propensity to lie both to the Court and to parties when it suits his needs is rivaled only by Doukas's. In view of this dismal track record, Goldstein cannot credibly claim that his failings in this case stem from inadvertence rather than intentional misconduct.

## D. Damages

An award of attorneys' fees and expenses jointly and severally payable by all of the Respondents is an appropriate sanction for their bad-faith litigation conduct. *See Chambers*, 501 U.S. at 45–46, 111 S.Ct. 2123. Under § 1927, the Court also may separately order Goldstein to pay the excess costs, expenses, and attorneys' fees Bavelis reasonably incurred because of such conduct.

█ In addition, the Court may award Bavelis punitive damages in an amount to be determined. *See Adell v. John Richards Homes Bldg. Co. (In re John Richards Homes Bldg. Co.)*, 552 Fed.Appx. 401, 414 (6th Cir. 2013) ("In this Circuit ... bankruptcy courts appear to have some authority to award punitive damages for abuse of process and fraud on the court under both § 105(a) and the court's inherent powers."). But while bankruptcy courts have "authority to award mild noncompensatory

---

**20.** As the Court noted in *Bavelis I*, Doukas described his business as "creat[ing] a lever-age that you can negotiate so it will make money...." *Bavelis I*, 490 B.R. at 268.

punitive damages," they lack the authority to award "serious noncompensatory punitive damages." *Id.* at 415. Thus, depending on whether the Court determines to make an award of punitive damages, and, if it does so, the amount of the award, the Court will either enter final judgment or submit proposed findings of fact and conclusions of law to the District Court.

## VI.  Conclusion

For the reasons explained above, the Court determines that sanctions shall be imposed against all of the Respondents under § 105(a) and the Court's inherent authority and against Goldstein under § 1927. The amount of attorneys' fees for which the Respondents shall be liable will be determined at a later hearing. In addition, during the same hearing, the Court will assess the amount of punitive damages, if any, that it will award.

The Court will hold a status conference in this matter on **March 2, 2017 at 10:00 a.m.** in Courtroom A, United States Bankruptcy Court, 170 N. High Street, Columbus, Ohio 43215. Bavelis shall file a statement of attorneys' fees and expenses that he seeks to recover no later than **March 24, 2017.** The fee statement shall establish that the fees and expenses Bavelis seeks to recover were: (1) incurred due to the bad faith misconduct described in this opinion; and (2) reasonable and necessary. The fee statement also should provide a basis for any punitive damages being sought by Bavelis. The Respondents shall have until **April 14, 2017** to file an objection to the fee statement. Any objection must state with particularity why any fees or expenses set forth in the fee statement—and any punitive damages sought by Bavelis—should not be awarded to him. A hearing on the fee statement and the objection will be held on **April 20, 2017 at 9:30 a.m.** in Courtroom A, United States Bankruptcy Court, 170 N. High Street, Columbus, Ohio 43215.

**IT IS SO ORDERED.**